IN THE MATTER OF THE RECEIVERSHIP OF THE FIRST TRUST & SAVINGS BANK OF BILLINGS, MONTANA.  GAZETTE PRINTING CO. ET AL., RESPONDENTS, *v.* McCONNELL, APPELLANT.

(No. 3,075.)

(Submitted February 16, 1912. Decided February 27, 1912.)

[122 Pac. 561.]

*Receivers—Sales—Setting Aside—Grounds—Equity—Power of Court—Appeal and Error—Findings—Conclusiveness.*

Appeal and Error—Findings—Conclusiveness.
    1.  A finding on conflicting evidence is conclusive on appeal.
Receivers—Sales—Right to Set Aside.
    2.  A court of equity in receivership proceedings may set aside an order of sale either before or after confirmation, when it appears that the same was entered through mistake, inadvertence, or improvidence.
Same—Sales—Setting Aside—Notice.
    3.  A purchaser at a receiver's sale takes with notice that the court may, in its discretion, set the sale aside.
Same—Sales—Right to Set Aside—Grounds.
    4.  Though mere inadequacy of price is not ordinarily in itself sufficient to warrant the setting aside of a receiver's sale to a *bona fide* purchaser, yet, where the property was greatly undersold and the purchaser obtained an undue advantage of the creditors, the court may, in its discretion, set the sale aside, though the buyer acted in good faith.

Same.

5. The power of a court of equity to set aside a receiver's sale is not affected by the fact that the purchaser acted in good faith, without intending to obtain an unfair advantage, complied with the terms of sale, and cannot be placed *in statu quo;* but such facts must be considered by the court in the exercise of its discretion.

Same.

6. Where a receiver's sale is set aside, the purchaser must, if possible, be reimbursed for damages sustained thereby.

Same.

7. Mere lapse of time does not affect the power of a court of equity to set aside a receiver's sale, though it may be considered by it in the exercise of its discretion.

Same—Sales—Setting Aside—Grounds—Evidence.

8. Evidence *held* to support a finding that an order of sale in receivership proceedings was made through mistake, inadvertence, or improvidence, justifying the setting aside of the sale.

Equity—Maxims.

9. One coming into a court of equity must come with clean hands.

Receivers—Compelling Sale to Bidder.

10. One offering to purchase at a receiver's sale for $6,000 property for which he had paid $40,000 three years before, may not appeal to a court of equity to compel a sale to him at that price, where the evidence showed that he was familiar with the property and that it had doubled in value during the three years.

Same—Jurisdiction of Court.

11. A court of equity in receivership proceedings must protect the creditors, and see to it that the property is sold to the best advantage, for all it is worth, if possible.

Same—Sales—Relief to Purchaser on Setting Aside of Sale.

12. Where the court setting aside a receiver's sale exonerated the purchaser from wrongdoing, the purchaser should be placed *in statu quo.*

*Appeal from District Court, Yellowstone County; Sydney Sanner, Judge.*

In the Matter of the receivership of the First Trust & Savings Bank of Billings. From an order granting a motion of the Gazette Printing Company and others to set aside a sale by the receiver to O. W. McConnell, the latter appeals. Affirmed.

*Messrs. Gunn & Hall,* and *Mr. Chas. A. Taylor,* for Appellant, submitted a brief; *Mr. M. S. Gunn* argued the cause orally.

*Mr. O. W. McConnell,* appearing *pro se,* submitted a brief and argued the cause orally.

*Mr. O. F. Goddard* and *Mr. F. L. Tilton* submitted a brief for Respondents; *Mr. T. J. Walsh,* of counsel, argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

On the fourteenth day of July, 1910, the district court of Yellowstone county, Hon. Sydney Sanner, judge presiding, on petition of the state of Montana, a creditor in the sum of $25,000, appointed Samuel G. Reynolds as receiver of the First Trust & Savings Bank of Billings, Montana, an insolvent corporation theretofore organized under the laws of this state. The Gazette Printing Company is a domestic corporation, having a capital stock of 300 shares of a par value of $100 each, located at Billings, owning a plant and Associated Press franchise, and engaged in publishing two daily newspapers, the "Billings Daily Gazette" and the "Billings Evening Journal." Among other assets of the First Trust & Savings Bank of Billings, which came to the hands of the receiver, were 297 shares of the capital stock of the Gazette Printing Company, which stock was the absolute property of the bank, and certain claims against the printing company. It appears to be admitted that on November 29, 1910, these claims, which were evidenced by promissory notes, amounted, with accrued interest, to the sum of $13,035.38. The stock in the printing company was carried arbitrarily on the books of the bank at a valuation of $6,001. The total of these two amounts is $19,036.38, the significance of which sum will hereafter become apparent. P. B. Moss was the president of both corporations. He testified: "I paid $40,000 for the stock, and charged it down from the profit of the company and otherwise down to $6,000. That is how the value of $6,000 got into the stock." It will thus be seen that the amount at which the stock was carried on the books of the bank was no criterion of its real value. On or about the thirty-first day of October, 1910, the receiver, at the request of Mr. Moss, procured from Hon. Sydney Fox, judge of the thirteenth judicial district, an order authorizing him to sell the notes and capital stock of the printing

company to unnamed persons, for the amount due upon said notes, and $6,001 additional for the 297 shares of capital stock. This order was never filed in court.   There was some controversy at the hearing subsequently had as to what conversations took place between Reynolds and Moss after the order was procured; but, at any rate, it is clear that Mr. Moss was experiencing some difficulty in getting the money.   He himself testified that on November 15, 1910, he offered to pay enough money to take up the stock, and was told by Reynolds that Judge Fox had instructed him not to surrender the stock until the notes were paid, whereupon they agreed that the matter might rest until Moss could get all the money.   On November 21, 1910, the notes and stock not having been sold to Moss, the receiver presented to Judge Fox a petition wherein he set forth that the former order of the judge had not been complied with; ''that such proposition has not been fulfilled, and now your petitioner has a proposition offered to pay in full liquidation and payment of the obligations of the Gazette Printing Company to the defendant for the capital stock now held by the bank and carried on its books at the sum of $6,001 the sum of $15,000; that your petitioner now desires to submit this proposition to the court, and, if in the judgment of the court or judge thereof such sale should be made, your petitioner asks for an order to sell,'' *etc.*   The court thereupon ordered the sale to be made in accordance with the terms set forth in the petition last mentioned.   The sale was accordingly made to Odell W. McConnell, the appellant; and the notes and certificates of stock were transferred to him.   On December 3, 1910, a petition was filed in the district court of Yellowstone county in behalf of the Gazette Printing Company, verified by P. B. Moss, and entitled, ''In the Matter of the Receivership of the First Trust & Savings Bank of Billings, Montana.''   The petition recites the facts substantially as hereinbefore set forth, and alleges that the second order of sale was made notwithstanding the prior order, ''and notwithstanding the said P. B. Moss was ready, able, and willing to take up said indebtedness and receive said notes and shares of stock, and without giving any

notice or warning whatever to said Moss or the Gazette Printing Company.'' It is therein further alleged: ''That on the twenty-fourth day of November, 1910, the Gazette Printing Company, by P. B. Moss, its president, and also by and through O. F. Goddard, Esq., its attorney, made demand upon the receiver that he call in said notes and certificates of stock, and that the printing company was ready to pay over the full amount of the indebtedness held by said trust against it, but the receiver refused to do so; that on the twenty-ninth day of November, 1910, the Gazette Printing Company, by P. B. Moss, its president, made a formal tender to the receiver of $19,036.38, being the amount due, principal and interest, on said promissory notes, and also including $6,001, for which the said receiver had the said 297 shares of stock, which amount the receiver 'took into his possession,' but has refused to deliver the notes and shares of stock; that, unless the last-mentioned order [the McConnell order] is rescinded, the creditors of said trust will be damaged in the sum of $4,036.38, and the Gazette Printing Company will be irreparably injured and defrauded of its property, and great injury will be done.'' The prayer was that the court set aside the order by virtue of which the appellant purchased the notes and stock; ''that the first-mentioned order be revived and the receiver required to accept the $19,036.38, and to surrender to the Gazette Printing Company the promissory notes, as well as the 297 shares of its stock.'' After answers filed by Reynolds, as receiver, and Mr. McConnell, and a reply to the receiver's answer, filed by P. B. Moss, who styled himself ''the petitioner herein,'' a hearing was had before Judge Sanner. At this hearing Mr. Moss testified that in the latter part of August, 1910, the Gazette Printing Company was indebted to the First National Bank of Billings in the sum of about $12,000; that Reynolds did not inform him of the second order of sale until after the notes and stock were sold to McConnell; that, if he had done so, he, Moss, could have gotten the money for him, but he did not suppose there was any hurry about it; that the inventory value of the physical property of the Gazette Printing Company is $30,000, the goodwill and

franchise is worth from $30,000 to $40,000, the profits "last year" were around $8,000; "that would be a profit on $75,000 or $80,000 at ten per cent net profits, including the interest paid and the net profit and the addition to the plant, figures up about $8,000. * * * Q. What do you say as to $15,000 or $19,000 being an inadequate price or consideration for the Gazette Printing Company's business and plant? A. The price was entirely inadequate as to the value of the property, but the estimate that the state examiner placed upon the assets of the trust company put down the stock as worthless, and I figured from conversations that I had with Mr. Reynolds, and some time previous, that the plant would be sold for very much less than its value. I got that part of the tender to meet and liquidate these notes held by the receiver from Mr. Snidow. I did not undertake to tender any part of this upon the part of the Gazette Printing Company to obtain this stock of the Gazette Printing Company. My wife was paying $6,001 for the stock. The First National Bank has since been paid in full. One share of the Gazette Printing Company's stock was issued to me, one to Mr. Hays, one to Mr. Becker, and 297 to the First Trust & Savings Bank. The paper was bought with the money of the First Trust & Savings Bank, except the three shares. There has been no election of officers or directors since 1907. The vacancy caused by the resignation of Mr. Becker has not been filled yet. The amount of the note which Snidow got of the Gazette Printing Company was $25,000. I don't know why it was that in my reply I styled myself as the petitioner, and not the Gazette Printing Company at all. I think this paper of the Gazette Printing Company is worth around $75,000. The company owes Mr. Snidow $25,000 and Mr. Jenizon $2,000. Out of the $25,000 paid by Snidow the trust company and the First National Bank were paid. I paid the First National Bank between $12,000 and $13,000."

C. E. Wood, manager of the Gazette Printing Company, produced as a witness by the petitioners, testified: "During the last year I think it [the Gazette Printing Company] has paid a profit of probably ten per cent. I think it made a profit of ten per

cent on the gross $80,000 or $90,000. I think that would be safe. The property, the franchise, and the goodwill of the Gazette Printing Company possibly is worth somewhere between $60,000 and $70,000—might be more than that.''

Judge Sanner filed a ''memorandum and order,'' wherein he recites, referring to the hearing had before him: ''Nothing appeared to especially engage the concern of the court in behalf of either Moss, or Mrs. Moss, or of the printing company. Whether or not Moss, or Mrs. Moss, or the printing company can be said to have been injured by this transaction, it is certain that unless set aside, the creditors of the trust will have lost some $4,000 by it.'' He then very properly exonerated Mr. McConnell, and the receiver, Mr. Reynolds, from any suspicion of bad faith in the transaction. He did find, in effect, however, that the court was not fully advised as to all of the facts and circumstances surrounding the transaction at the time of signing the second order.

There is a conflict of testimony on this point, and we are bound [1] by the finding of the trial judge. (*Slater Brick Co.* v. *Shackleton,* 30 Mont. 390, 76 Pac. 805.) There is not anything in the record to indicate that the receiver or anyone in his behalf knowingly or willfully deceived or withheld information from the court; but even so, it is entirely possible that the second order of sale was inadvertently and improvidently made. The question is: Did the court have power subsequently to set it aside? Judge Sanner, being of opinion that he had such power, entered the following order, from which an appeal has been perfected by Odell W. McConnell, *viz.:* ''It is therefore ordered that the order heretofore made and entered herein on November 21, 1910, authorizing the sale of said property for $15,000, and all the proceedings had thereunder be, and the same are, hereby annulled; that within thirty days of the filing hereof the receiver herein return to Odell McConnell the sum of $15,000 heretofore paid under said order for said property by said McConnell, and that said McConnell redeliver said property to the receiver herein, making such appropriate indorsements or conveyance as may be necessary

to pass title to the same; that the receiver cancel and deliver to the Gazette Printing Company the said promissory notes and transfer to Mattie W. Moss the said shares of capital stock, in consideration of the sum of $19,036.38, now held by him under the Gazette Printing Company's tender of November 29, 1910; that each party to this proceeding pay his own costs.''

1. The first contention with which we have to deal is that of the respondents. They urge, through their counsel, that this court has no jurisdiction to hear the appeal because no notice of it was ever served on either the state or the First Trust & Savings Bank. It is enough to say in answer to this contention that neither of the parties mentioned was made a party to these proceedings by the respondents themselves. They entitled their petition, ''In the Matter of the Receivership,'' *etc.*, and obtained an order to show cause why their prayer should not be granted, directed only to S. G. Reynolds, the receiver, and Odell W. McConnell, the purchaser at the sale. These parties came into court as directed, filed their answers, to which the petitioners replied, and the issues so made up were fully tried. After the final order of the court was entered, Mr. McConnell, the party feeling himself aggrieved thereby, gave notice of appeal to the only other persons who were parties to the proceedings, to wit, P. B. Moss, Mattie W. Moss, the Gazette Printing Company, and S. G. Reynolds, the receiver of the bank. The disposition we shall make of the case will fully protect the First Trust & Savings Bank and all of its creditors, including the state of Montana.

2. For the appellant it is contended that the sale to him was complete, that his rights thereunder had vested, and the court had no power to set it aside. In support of this contention he cites the cases of *Files* v. *Brown*, 124 Fed. 133, 59 C. C. A. 403; *Koontz* v. *Northern Bank*, 16 Wall. 196, 21 L. Ed. 465; *Kimple* v. *Conway*, 75 Cal. 413, 17 Pac. 546; *White* v. *Rand (In re Denison)*, 114 N. Y. 621, 21 N. E. 97; *Morrison* v. *Burnette*, 154 Fed. 617, 83 C. C. A. 391; *Virginia F. & M. Ins. Co.* v. *Cottrell*, 85 Va. 857, 17 Am. St. Rep. 108, 9 S. E. 132; *In re Perryman*, 7 Ind. Ter. 472, 104 S. W. 804; also, High on Receivers, 4th ed.,

p. 782.   The principal case is *Files* v. *Brown.*   In that action the receiver of the First National Bank of Little Rock, Arkansas, filed his petition in the circuit court praying for an order directing him to accept a bid of $25 made by Files, for a judgment of $9,230.90 against one Kelso, which was one of the assets of the bank, and authorizing him to make the sale and assign the judgment to Files.   The court ordered the receiver to accept the bid and sell and assign the judgment, and the receiver complied with the order.   Afterward the latter petitioned the court to rescind the sale, on the ground that he had since learned that the debt evidenced by the judgment was secured by a pledge of certain collateral notes.   He set forth that he was unable to state the exact value of the notes, but that he was led to believe that about $3,200 was to be distributed in part payment thereof.   He also alleged that at the time of the sale of the judgment Files knew of the existence of the collateral notes and of their probable value.   The circuit court of appeals said: ''The order to the receiver to sell and convey the property to a purchaser named, for a price fixed in the order, is itself both an acceptance of the bid and a confirmation of the sale so that, when the order has been executed, the court is as firmly bound in law and in morals as any private citizen by his executed sale.''   The court proceeded, however, to inquire into the questions of inadequacy of consideration and bad faith on the part of Files, and determined both questions in his favor.

In the case of *Koontz* v. *Northern Bank, supra,* the sale had been confirmed by the court after a master had examined the report of the receiver thereon and had recommended its confirmation.

The supreme court of California in *Kimple* v. *Conway, supra,* held that there was no law in that state requiring confirmation of a sale of land by a sheriff under a decree for the sale of community property.

In *White* v. *Rand, supra,* the court of appeals of New York held that defendant's offer to purchase a judgment from a re-

ceiver, which offer the court had authorized the receiver to accept, constituted a judicial sale which could be enforced on motion.

In *Morrison* v. *Burnette, supra*, the United States circuit court of appeals held that on confirmation of a judicial sale the rights of the purchaser became vested. There was "no fraud, no mistake, no surprise, no accident, no equitable ground for setting it aside," no inadequacy of price; therefore, it should not have been rescinded on motion of an unsuccessful bidder. To the same general effect is the decision of the court in *Virginia F. & M. Ins. Co.* v. *Cottrell, supra*.

The court of appeals of Indian Territory, in *Re Perryman, supra*, held that an order confirming a sale of an oil and gas lease was a final order which the court had no power to set aside, even during the term at which it was made, for inadequacy of price or on other grounds, other than ones for which a court of equity might avoid a judicial sale.

Not any of these decisions, however, reaches the point involved in this case. The question here is: Have courts of equity in receivership proceedings the power to set aside orders of sale which have been inadvertently and improvidently made? We fully agree with the learned trial judge that the court was not concerned with any supposed rights of P. B. Moss, or Mrs. Moss, or the Gazette Printing Company, in the premises. But we are of opinion that in the interests of the trust inquiry should have been made concerning the identity of the unnamed bidder who had offered $19,036.38 for the property and the probability of his being able to comply with the terms of his offer. If appellant's position is correct, on the authority of *White* v. *Rand, supra*, this sale could probably have been enforced. If a court has by mistake or inadvertently, or by improvidence, made an order which, but for such mistake, inadvertence, or improvidence would not have been made, it matters not by what agency the court was induced to act. Judge Fox himself testified at the hearing: "If I had thought or had believed that Mr. Moss or the Gazette Printing Company, or anyone else, would have taken up the indebtedness of that company and taken up the stock for

$19,000, I would not have signed this order at that time." While the judge had power to make the second order without notice, we cannot doubt that had his attention been directed to the fact that there was any possibility of disposing of the property for more than $15,000, he would not have made it. There is also evidence to warrant the lower court's conclusion that the idea was conveyed to the judge from some source that, if the payment of the notes held by the First National Bank was delayed, the property of the printing company might be sacrified at sheriff's sale.

In the case of *Weeks* v. *Weeks,* 106 N. Y. 626, 13 N. E. 96, the court said: "The general power of a court to modify or vacate its judgments or orders for fraud or irregularity or where it has acted inadvertently, or improvidently, is well settled. It is true the law protects the title of a third person, being a *bona fide* purchaser at a sale on an execution under a judgment voidable, but not void, although the judgment is subsequently reversed for error. This principle does not, we think, preclude the court from modifying or vacating a summary order made improvidently in the course of an action, although the rights of third persons may be affected thereby." In this case the trial court had authorized the receiver to make a lease for three years. His trust was terminated before the expiration of the lease. The court, therefore, modified the order by reducing the term of the lease to one year. The court of appeals affirmed this order, and, in addition thereto, directed the receiver to indemnify the lessees out of the funds in his hands for any damages they had sustained, saying: "Nothing less will satisfy the claims of justice."

In *Hale* v. *Clauson,* 60 N. Y. 339, the court said: "The court has power to set aside judicial sales, made pursuant to its judgments, or orders, for fraud or irregularity.   *   *   *   A purchaser at a sheriff's sale, although a stranger to the judgment or decree, by his purchase submits himself to the jurisdiction of the court, in respect to the sale and purchase.   *   *   *   A conveyance to a *bona fide* purchaser may be a circumstance which will influence the court in the exercise of its discretion, but it does

not take away jurisdiction.''   (See *Wakeman* v. *Price,* 3 N. Y. 334.)

In the case of *Horse Springs Cattle Co.* v. *Schofield,* 9 N. M. 136, 49 Pac. 954, the supreme court of New Mexico laid down the broad principle that a sale by a receiver under an order of the court should be set aside whenever it appears that the purchaser is enjoying an unreasonable advantage by the sacrifice of the property through mistake.   The court said: ''If the court should become advised that, either from mistake or other cause, the receiver was disposing of the property at a sacrifice, it would become the duty to stay his hand.   This duty did not depend upon proof of corruption or bad faith, but, even though the receiver acted by mistake of fact, it would be equally the duty of the court to protect the estate which it was administering.   The receiver was the trustee of all parties in interest.   It was his duty to see that the property realized the highest sum, and it was the duty of the court to see that he did.   *   *   *   We are of opinion that the evidence shows that the order authorizing the receiver to sell these cattle was based upon great and material errors as to the number of cattle and the reasonable value thereof, and that to refuse to set the sale aside would result in permitting the purchaser to enjoy an 'unconscionable advantage,' by the sacrifice of the property through such mistake.   When the purchaser bid upon the property, he submitted himself to the jurisdiction of the court as to all matters connected with the sale and relating to him in the character of purchaser.''   The court then ordered that the purchaser's money be returned with six per cent interest.

In *Blackburn* v. *Selma R. R. Co.* (C. C.), 3 Fed. 689, the United States circuit court for the western district of Tennessee held, in effect, that a sale should be set aside when the circumstances afford substantial evidence that for some perhaps unknown reason the property has been greatly undersold.

In *Anderson* v. *Foulke,* 2 Har. & G. (Md.) 356, the chancellor declared: ''If there should be made to appear, either before or after the sale has been ratified, any injurious mistake, misrepre-

sentation or fraud, the bidding will be opened, the reported sale will be rejected, or the order of ratification will be rescinded, and the property again sent into the market and resold.   \*   \*   \*
In all judicial sales under orders or decrees of this court the rule *caveat emptor* has been applied.''

[2–7]   From the foregoing and other cases we deduce the following rules of law: (a) That a court of equity has jurisdiction to set aside an order of sale, either before or after confirmation, whenever it is made to appear that the same was entered through mistake, inadvertence, or improvidence; (b) that the purchaser at such sale takes the property with notice that the court has power, in its discretion, to set it aside; (c) that, while mere inadequacy of consideration is not ordinarily in itself sufficient to warrant the court in setting aside a sale to a *bona fide* purchaser, if it shall appear that for some reason, disclosed or undisclosed, the property has been greatly undersold and the purchaser has, even in good faith, obtained an undue advantage of the persons for whose benefit the sale was made, the court may, in its discretion, set it aside; (d) that the fact that the purchaser acted in good faith, without intention to obtain an unfair advantage, and has fully complied with the terms of the sale, or even that he cannot be placed *in statu quo,* does not affect the power of the court to rescind the sale, but all of these facts should be taken into consideration by the court in the exercise of its discretion; (e) that, when a sale is rescinded, the purchaser should, if possible, be reimbursed for any damage he sustains by reason of its rescission; (f) that the question of the time within which a rescission should be ordered may be considered by the court in the exercise of its discretion, but mere lapse of time does not affect its power to rescind.

We must not forget that this is an equitable proceeding, the ultimate object of which should be to dispose of 297 shares of the capital stock of the Gazette Printing Company at the highest obtainable price, for the benefit of the creditors of the [8]   First Trust & Savings Bank.   So far as the record discloses, it has resolved itself into a conflict between Mr. McCon-

nell and Mr. Moss to ascertain which shall control the ''Billings Daily Gazette'' and the ''Billings Evening Journal.'' We say this advisedly, for while the testimony shows that the $6,001, therein mentioned, came from Mrs. Moss, it also discloses that Mr. Moss was the active agent in the transaction, that he is now in control of the affairs of the Gazette Printing Company; and it is fair to assume, we think, that such control has existed since 1907. Mr. Moss testified: ''I paid Becker $40,000 for the stock. I purchased the property of Becker. We more than doubled the business since I got it. I got all the money from Snidow.'' In fact, it appears that Mr. Moss is, in effect, the Gazette Publishing Company. At or about the time of the two offers to purchase from the receiver, the indebtedness of the printing company, so near as we are able to figure, was about $27,000, and remains at substantially that amount to-day. That is to say, in lieu of owing about $12,000 to the First Trust & Savings Bank and about $13,000 to the First National Bank, as it did at that time, it now owes Snidow $25,000; and, in addition thereto, it is indebted to one Jenizon in the sum of $2,000. We are, of course, speaking with reference to the day of the hearing, having no means of knowing whether any part of the indebtedness has since been paid. However, if the newspapers continue to earn a net annual income of $8,000 as they did during the year immediately prior to the hearing, it is not at all unlikely that the indebtedness has been greatly reduced. What was the value of the property of the Gazette Printing Company at the time of the sale of practically all of its stock to the appellant? As the trial judge found for the respondents, it is not unreasonable to conclude that he deemed the price paid an inadequate one. Moreover, it is strenuously contended by the respondents' counsel that it was grossly inadequate. In this latter conclusion we concur. Moss paid Becker $40,000 for the stock in 1907. The company has the exclusive Associated Press franchise in the immediate vicinity of Billings, and, according to all of the testimony, an exceptionally profitable field of circulation for its newspapers.

In 1907 the physical property alone was worth $30,000, and since that time $8,000 of improvements have been added thereto. The goodwill and franchise were thought to be worth $20,000 in 1907, and Moss testified: ''We more than doubled the business since I got it, so I can say that $30,000 or $40,000 would not be an unreasonable figure to place upon the goodwill and franchise. The net profits for the year prior to November 1, 1910, were $8,000. That would be a profit on $80,000 at ten per cent net profits, including the interest paid and the net profit. And the addition to the plant figured up about $8,000.'' It is not entirely clear from this testimony whether the company added $8,000 to its plant besides paying $8,000 in net profits or not, but, at any rate, $8,000 would be statutory annual interest on $100,000. Mr. Wood testified that he considered the business ''a prosperous concern,'' and that the prospects were it would improve in the future. We heartily agree with the respondents that $15,000 was a grossly inadequate price for the stock and notes. The newspapers would pay this amount in less than two years. Let us recollect, too, that the $15,000 not only purchased the stock, but also increased the value thereof by wiping out an indebtedness of the company of about $12,000 to the First Trust & Savings Bank, leaving the only creditors the First National Bank, in the sum of about $13,000, which amount has since been paid from the proceeds of the Snidow note, and Mr. Jenizon in the amount of $2,000. The result of these figures is that for $15,000 the purchaser virtually purchased a concern worth at least $80,000, with an indebtedness of about $15,000. The net profit was $50,000. We conclude, therefore, that Judge Sanner was correct in his determination that the second order of Judge Fox was made through grave mistake and inadvertence, and improvidently. It follows that the order was properly rescinded and set aside.

3. But were the respondents in a more favorable situation to appeal to a court of equity than was the appellant? Of the [9] many maxims of equitable jurisprudence perhaps the best

known and most salutary is that a suitor must approach the court with "clean hands."

Every consideration which operated against the appellant is equally applicable to the respondents. More so, indeed, for Mr. Moss confessedly knew the real value of the property, and, so far as the record shows, Mr. McConnell did not. There is not any force in the suggestion that the stock was carried on the books of the company at but $6,000. Mr. Moss admitted on the witness-stand that he "figured the plant would be sold for very much less than its value." He had an intimate acquaintance with the affairs of the company, financial and otherwise, and was in a position to judge of the real worth of its [10] assets. He offered $6,001 for property for which he had paid $40,000 but three years before. We are not advised that it had any indebtedness at that time; but, if it had any, there is no suggestion that the same was not paid from the funds of the company itself. In three years the property had practically doubled in value, and the field of usefulness of the newspapers operated by the company had greatly increased.

The function of a court of equity in cases like this is to have [11] a vigilant eye to the interests of the beneficiaries of the trust which it has in charge. The main, in fact the only, consideration should be that the unfortunate creditors of the defunct bank and trust company shall realize the greatest possible amount from the disposal of its assets. If the testimony of the respondent, Mr. Moss, is to be given full force and effect, the property of the bank will be sold at an enormous sacrifice, whether the sale price be $15,000 or $19,000. In either event they will lose many thousands of dollars to which they are justly entitled. If, as indicated by his testimony, this loss would amount to $50,000 in case of a sale to the appellant for $15,000, it will amount to $46,000 in the event of a sale to him. The assets of the trust should be sold for the highest amount which it is possible to realize therefor, to the end that the rights of the creditors may be fully protected. Every opportunity for investigation and competitive bidding should be afforded

to all who contemplate purchasing. We do not mean to indicate how the sale shall be made. That is a matter for the district court to determine in its discretion. Neither do we wish to be understood as deciding that the amounts heretofore referred to must necessarily be realized. What we do hold is that the property should be sold to the best advantage, and for all it is worth, if possible.

If we merely affirm the order appealed from, we shall concur, not only in that portion rescinding the sale to the appellant and directing the return of his money, but also in that part thereof ordering a sale to Mrs. Moss and the Gazette Printing Company for $19,036.38. We cannot in equity and good conscience do this.

The receiver now has in his hands the sum of $15,000 belonging to Mr. McConnell, $6,001 belonging to Mrs. Moss, and $13,035.38 belonging to the Gazette Printing Company. This latter amount was realized through Mr. Moss upon the company's note to Snidow. It is proper that the receiver shall retain this amount and cancel and deliver the company's notes, after receiving the same from the appellant, to the proper officer of the printing company. The record shows that the receiver has other funds in his possession. Judge Sanner having [12] exonerated Mr. McConnell from wrongdoing, it is proper that he shall be placed *in statu quo*.

It is therefore ordered that those portions of the order appealed from rescinding the sale to the appellant, directing the return of his money, and that he shall redeliver the stock and notes to the receiver, be and the same are hereby affirmed. It is also ordered that out of any appropriate funds in his hands the receiver shall pay to Mr. McConnell interest on the said sum of $15,000 at eight per cent per annum from the twenty-first day of November, 1910. That portion of the order requiring the receiver to cancel and deliver to the Gazette Printing Company its promissory notes is also affirmed. That part thereof directing the receiver to deliver 297 shares of the capital stock of the Gazette Printing Company to Mattie W. Moss is

reversed, and the receiver is ordered to return to Mattie W. Moss, or her accredited agent, the sum of $6,001, so paid to him by her, through P. B. Moss. The district court of Yellowstone county is directed to ascertain whether in its judgment Mattie W. Moss is entitled to interest on the sum of $6,001 deposited by her, and, if so, to allow such interest. Each party to this proceeding shall pay his own costs in this court.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.