WHITCOMB, Administrator, Respondent, v. KOECHEL, et al., Appellants.

No. 8567
Submitted March 21, 1945. Decided May 9, 1945.
158 Pac. (2d) 496

Mr. Fred C. Gabriel, of Malta, for Appellants.

Mr. James T. Harrison, of Malta, and Mr. James T. Shea, of Glasgow, for Respondent.

MR. JUSTICE MORRIS delivered the opinion of the court.

This action was commenced by the administrator of the estate of William Peters, deceased, to quiet title to three lots located in the town of Saco, Phillips county. The complaint alleges that Peters gave a quitclaim deed to the lots to a neighbor, George C. Koechel, May 22, 1939, pursuant to an agreement to the

effect that Koechel would hold title to the lots in trust for Peters and reconvey the same to him on demand. It appears that Peters being unable to pay the taxes on the lots, title thereto had been taken by Phillips county and the conveyance to Koechel was made for the purpose of having Koechel purchase the lots for and on account of Peters at a tax sale advertised by the county. It is further alleged that Koechel gave no consideration for the quitclaim deed; that Koechel and Peters together attended the tax sale at Malta, May 22, 1939, at which time Koechel bought the lots for $325, making a down payment of $130 and entering into a contract with Phillips county to pay the balance in annual installments. It is further alleged by plaintiff that the money for the down payment was furnished by Peters and that all the subsequent installments were paid by him, and that all taxes levied against the lots after the sale were likewise paid by Peters, and that he exercised dominion over the property up to the date of his death, collecting the rents and making necessary repairs to the cottage located on the lots. It is further alleged by the plaintiff that after qualifying as administrator he and his attorney visited Koechel at the latter's home near the town of Saco and demanded a reconveyance of the property to the administrator which was refused. Plaintiff prays that the defendants be required to set forth their claims of title to the property and that such claims be determined to be without merit and that defendants be forever barred from asserting any claim to the premises described and further prays for costs.

*Lis pendens* was filed at the time the action was begun. A general demurrer to the complaint was overruled; the answer is in the nature of a general denial followed by an affirmative defense wherein it is set up that Peters was indebted to a certain building and loan company on a mortgage note secured by the lots which had been given prior to the time that the county took the tax deed and that Peters claimed to have paid practically all, if not all, of the mortgage but the building and loan company having become involved in financial troubles had transferred Peters' note and mortgage to another concern and Peters

desired Koechel to hold the title to the lots in order to avoid the obligation to the building and loan company. Koechel pleads this alleged "fraud" as grounds for estoppel against the administrator to claim any interest in the lots. By a cross-complaint defendant alleges that after the purchase of the tax title from Phillips county he obtained the quitclaim deed from Peters in order to clean up any possible flaw in the tax title proceedings and that he paid Peters a consideration of one dollar for the deed. The defendants conclude their answer, affirmative defense and cross-complaint with the prayer that title in the lots be quieted in George C. Koechel. A copy of the contract of sale between Koechel and Phillips county was made Exhibit A to the answer and cross-complaint. By reply all affirmative matter set up in the answer and cross-complaint was denied.

The matter came on for hearing before the court sitting without a jury. Witnesses were sworn and testified; documentary evidence was introduced by both parties; briefs were submitted and, in due course, judgment was made and entered in favor of the plaintiff, and the defendants were enjoined from asserting any claim to the lots adverse to the William Peters estate. The defendants appealed.

The first assignment of error is on the court's giving judgment for the plaintiff; the second alleges error as to a court finding; the third is not clearly stated but in substance is that by reason of the statute of frauds an estate in real property cannot be created except by an instrument in writing; the fourth is that by reason of the alleged fraud against the loan company by the decreased the plaintiff is estopped to claim any interest in the lots.

The defendants do not argue the assignments in the order submitted but proceed under certain contentions. We will take the matter up as brought before us under the assignments. Practically all the arguments advanced revolve around assignment one.

In a long line of decisions by this court the rule has been applied in actions such as this that where there is sub-

stantial evidence to support the lower court its findings will be accepted on appeal and findings of fact by a trial court based upon conflicting evidence will not be disturbed on appeal. (Gazette Printing Co. v. McConnell, 45 Mont. 89, 122 Pac. 561, Ann. Cas. 1913C, 1327; Alywin v. Morley, 41 Mont. 191, 108 Pac. 778; Williard v. Campbell Oil Co., 77 Mont. 30, 248 Pac. 219; Portland Cattle Loan Co. v. Featherly, 74 Mont. 531, 241 Pac. 322; Nelson v. Wilson, 81 Mont. 560, 264 Pac. 679; Commercial Bank & Trust Co. v. Jordan, 85 Mont. 375, 278 Pac. 832, 65 A. L. R. 968; Fousek v. DeForest, 90 Mont. 448, 4 Pac. (2d) 472.)

No findings were expressly made by the court in this case, but in such circumstances "every finding necessary to support the judgment of the court will be implied." (Steiner v. McMillan, 59 Mont. 30, 195 Pac. 836, 837; In re McLure's Estate, 63 Mont. 536, 208 Pac. 900; Town of Cascade v. County of Cascade, 75 Mont. 304, 243 Pac. 806; Clark v. National Surety Company, 81 Mont. 113, 261 Pac. 618; Sawyer v. Somers Lumber Company, 86 Mont. 169, 282 Pac. 852; Blaser v. Clinton Irr. Dist., 100 Mont. 459, 53 Pac. (2d) 1141.

We will leave the first assignment until we give such consideration to the others as we deem essential. What we have just said as to the rule on findings when none are asked nor made we think sufficient answer to the second alleged error and that assignment will not be noticed further.

The third assignment is "the trial court erred in holding that in the absence of a written agreement or memoranda to that effect, no trust under the evidence here was created or existed in favor of Peters." The argument is made that the statute of frauds deprives the plaintiff of the right to establish his claim of title to the lots for the reason that a trust estate in real property can be created only by an instrument in writing. In this connection sections 6859, 6860, 10611, 6783 and 6784, Revised Codes, are cited. Sections 6859, 6784 and 10611 have some bearing on this controversy in that each of those sections refers to trust estates created "by operation of law." The sec-

tion which controls here, however, is section 6785, which provides: "When a transfer of real property is made to one person, and the consideration thereof is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." The trust estate in the lots which the plaintiff claims in behalf of the Peters estate came to life "by operation of law" pursuant to section 6785. The evidence shows quite clearly that Peters made all payments on the purchase price of the tax title deed obtained from Phillips county that matured up to the time of his death, that he likewise paid all taxes on the lots, exercised dominion over the property, and that Koechel paid nothing for the quitclaim deed he received from Peters, and paid no part of the purchase price on the contract with the county. Koechel admits Peters paid all the purchase price to Phillips county except the down payment of $130, and that Peters paid all the taxes but that all such payments were made by Peters out of rent money received from tenants who occupied the dwelling on the lots, which collections and payments were made by Peters at Koechel's instruction and on his account. Koechel contends he made the down payment to the county of $130. That payment appears to have been made by a cashier's check issued by the First State Bank of Malta. The cancelled check was admitted in evidence. The record shows it was made out and signed by the president of the bank who testified that he delivered the check to Mr. Peters personally and that Peters paid him the money for it. It was issued May 19, 1939; a check of that amount was included in the bank deposit of the county treasurer on May 24th, and the check bore the endorsement of Peters; and on May 23rd a "tax title sales" receipt was issued to Koechel showing Koechel paid the county $130 on a "purchase payment" for the Saco lots involved in the controversy. Koechel was called as a witness by the plaintiff for examination and cross-examination pursuant to Chapter 180 of the 1943 Session Laws and testified in part as follows:

"Q. Who drew that quit claim deed? A. Mr. Livdahl.

"Q. At whose request was it drawn? A. I imagine Mr. Peters.

"Q. And you don't know anything about that? A. I wouldn't say definitely, that is a long time ago.

"Q. Well, what did you pay for that deed? A. I paid $130.00 I imagine.

"Q. For that quit claim deed? A. For the property.

"Q. And what did you get at the time the deed was delivered, being Plaintiff's Exhibit #2? A. I don't know as I got anything.

"Q. You didn't give one red cent for it did you? A. Well, I don't recall that I did.

"Q. Well, you know whether or not you handed him any money—did you hand Mr. Peters any money? A. Mr. Peters?

"Q. Yes. A. No, sir, I never handed him any money.

"Q. Not one cent? A. Not for the deed, I don't think I did. * * *

"Q. You went in and bought the property at the sale? A. Yes.

"Q. Did you pay anything down? A. Yes.

"Q. How much? A. $130.00.

"Q. In cash? A. Yes.

"Q. That was your own money? A. I think so, yes, sir.

"Q. Bill Peters didn't pay anything of that $130.00 payment? A. No, sir.

"Q. Not one cent? A. No, sir.

"Q. You never gave Peters any money to pay the $130.00? A. No, sir.

"Q. Directly or indirectly? A. No, sir.

"Q. Did you write a check on the bank to get the $130.00 to make the payment? A. No, sir, I did not.

"Q. You had the $130.00 in your possession? A. Yes.

"Q. Was Bill Peters in there at the time? A. Yes, sir, I think he was. * *

"Q. And that $130.00 was paid in cash by you as stated

to Mr. M. R. Nelson—is that right? A. Well, I think I paid that money to Mr. Livdahl and he went and got a receipt.

"Q. The sale was being conducted through the County Clerk's office was it not? A. Yes.

"Q. That is, the County Commissioners hold the sale and the Clerk clerks it? A. Yes, sir.

"Q. At the time of the purchase you did business with the Clerk and he went into the Treasurer's office and got a receipt? A. I think that is the way it was handled.

"Q. You think that is the way it was handled? A. Yes.

"Q. Anyway it was to Mr. Livdahl to whom you gave the $130 in currency or cash or whatever it was? A. I think it was.

"Q. As near as you know it was all currency—is that correct? A. Yes.

"Q. Was anyone present at the time you paid the $130.00 to Mr. Livdahl? A. Not that I recall besides Mr. Peters."

Carl Livdahl, deputy county clerk and recorder, testified in substance that Peters came to his office some time before the tax sale of the lots and talked with him about buying the lots back. "He stated that he had had some trouble with a loan concern and figured he had paid off their mortgage in full and he couldn't get a satisfaction, as a matter of fact the mortgage was assigned to a concern at Salt Lake City. He said it would not be proper for him to buy the property back under those conditions, and we (a Mr. Starbeck, county clerk, was present) suggested to him that he could have someone else bid it in for him at the tax sale." Peters and Koechel were in Livdahl's office the day of the sale and Livdahl drew the quitclaim deed, plaintiff's Exhibit A, conveying the lots from Peters to Koechel and took Peters' acknowledgment to the deed. The witness did not remember any of the conversation except he did recall Peters mentioning his trouble with the mortgage loan company. The witness identified Peters' signature on the cashier's check of $130, but did not remember who

made the down payment on the contract, nor who turned the $130 check over to the county.

Mr. Norman Starbeck, county clerk, testified in part as follows:

"Q. Do you recall Mr. Peters and Mr. Koechel appearing at your office on the day of the sale? A. Yes.

"Q. Just previous to that day, if you recall—do you recall Mr. Peters coming in there at any other time? A. Yes.

"Q. How long previous to the day of the sale? A. A few days previous to the sale.

"Q. Did you have any discussion with him at that time? A. Yes, I talked with him.

"Q. And what was your discussion about? A. Well, he mentioned this property coming up for tax sale and said he wanted to buy it back at the tax sale—and, if I may be permitted to use Mr. Peters own words—he said that he had given a mortgage to the United States Building and Loan Company and said that it had been practically all paid, but they still held that mortgage and I can't buy it back in my own name— I will have to get somebody else to buy the place in and I think I can get someone down at Saco to use as a third party.

"Q. And subsequent to that time did he again show up at your office? A. Yes, the day of the sale.

"Q. Who appeared with Mr. Peters there at that time? A. Mr. Koechel.

"Q. Was there any discussion had in your office between Mr. Peters and Mr. Koechel that you recall? A. I can't recall that.

"Q. Did you clerk the sale? A. Yes, I did.

"Q. And the sale was being conducted by the Board of County Commissioners was it not? A. Yes.

"Q. And do you recall whether or not anyone bid in the property which was the subject of this lawsuit, being Lots 9, 10 and 11 in Block 5 of the Townsite of Saco? A. Yes.

"Q. Do you know who bid the property in at that sale? A. George Koechel.

338

"Q. And at that time was there a contract executed between the county and Mr. Koechel? A. Yes.

"Q. And is Plaintiff's Exhibit #1 that contract? A. Yes.

"Q. And who was present when a deed was drawn between Mr. Koechel and Mr. Peters? A. Well, I was in the office but I don't know anything about the deed.

"Q. Do you know when it was drawn with reference to the sale? A. No, I do not.

"Q. Now, who made the $130.00 payment? A. I don't know about that—I know it was made the day of the sale, but whether Mr. Peters or Mr. Koechel paid the money I couldn't say. I did not handle that transaction. ·

"Q. You did not handle that transaction yourself? A. No, sir, I did not.

"J. Do you know if anyone else did? A. The only one who could have would be Mr. Livdahl.

"Q. He was Deputy Clerk and Recorder at that time? A. Yes.

"Q. And he is still here? A. Yes.

"Q. And still acting in that office? A. Yes.

"Q. Do you recall Mr. Peters being in your office later at any time, and did you have any conversation with him relative to this same property? A. Yes.

"Q. When was that? A. I couldn't say exactly as to that, I believe it was about two months before he died.

"Q. What was said at that time? A. Well he said I got to get this thing straightened up with Mr. Koechel—he said I am an old man and I have a niece and nephew in Minneapolis and if anything should happen to me I want to leave this property to them.

"Q. Was anything said about a deed from Mr. Koechel? A. Yes, I believe he mentioned something about he should get this title conveyed back to him, but he never did that."

We find no merit in the fourth alleged error relative to estoppel which is grounded on the assumption that Peters' alleged fraud against the loan company redounds to

the benefit of the defendants. The loan company is not a party to this action and any cause of action that might exist between other parties and the plaintiff has no bearing here.

We return now to the first assignment of error grounded on ██ the court's giving judgment for the plaintiff.

Harry Whitcomb, the plaintiff, testified in part as follows:

"Q. Do you recall having had a conversation with Mr. Koechel, the defendant some time during the month of December, 1942 following the death of William Peters? A. I do.

"Q. And who was with you at that time? A. Mr. James Harrison.

"Q. And where was that conversation had? A. At Mr. Koechel's ranch.

"Q. And where is that located? A. That is this side of Saco.

"Q. How far? A. I should judge probably about three miles.

"Q. And who was present at that conversation? A. Mr. Harrison, Mr. Koechel and myself.

"Q. What time of the day was it? A. It must have been around five o'clock.

"Q. What was said in that conversation? A. Well, we drove up there in the yard and stopped the car just east of the house and Mr. Koechel was out near the corrals which would be north of the car and we walked over toward them, and Jim said he would like to talk to him a minute, so we all walked back down to the car and when Mr. Koechel got over to the car Jim told him that William Peters' step-son had asked me to act as administrator of the estate; that there was some property in the estate belonging to Mr. Peters which was in his name and he said he had come down there to get a deed to it from Mr. Koechel to the William Peters estate so the estate could be cleared up, and he wanted to know if he would give him a deed, and Mr. Koechel said, I figure this is my property and I don't figure on giving any deed and Jim said why not. Well, he said, last fall when I got the tax notice and took

it down to William Peters I said to him I better give you a deed to this property, and he said, William Peters replied—you never mind, I would just as soon see you have it as anybody.

"Q. Now, at that time was that all that was said? A. Well, just before we left Mr. Harrison said—you won't give us a deed, and he said—no. That's all I remember."

The testimony of Mr. James T. Harrison, counsel for the administrator, is substantially to the same effect as shown by the following:

"Q. You are the attorney here representing Harry Whitcomb as Administrator of the Estate of William Peters, deceased? A. Yes.

"Q. Did you have occasion to go to the Koechel farm home and premises some time during the month of December, 1942? A. Yes.

"Q. When was it you went down there? A. On the 30th day of December, 1942.

"Q. And who went with you? A. Harry Whitcomb.

"Q. When you got there did you see the defendant in this case, Mr. Koechel? A. I did.

"Q. Who was present if anyone? A. Just the three of us.

"Q. What was said at that time? A. First I introduced Mr. Whitcomb to Mr. Koechel and I told Koechel we had come to see him with regard to the property belonging to William Peters which stood under his name under a contract for deed from the county.

"Q. Is that the same property as is the subject of this litigation? A. Yes, I told him he had a quitclaim deed to the property from Peters and in order to get it cleared up I asked him if he and his wife would execute a quitclaim deed and he said, do you think I should, and I said—why not, and he said last fall when he had taken the tax notice over so Bill could pay the taxes on it and he wanted to give him a deed and when he brought that matter up he said Bill told him that he didn't know of anybody he would rather see have the property than him.

"Q. Did you at that time know that Koechel was claiming title to the property? A. No, that's all he said."

The testimony of these two witnesses along with the other evidence to which we have alluded leaves no doubt as to the right of the matter. The evidence is conflicting only by reason of the testimony of Koechel and his wife, both interested parties, and in such circumstances and in accord with the authorities heretofore cited we must affirm the decision of the trial court.

The record reveals no errors of law and the judgment is affirmed.

Mr. Chief Justice Johnson and Associate Justices Adair, Angstman and Cheadle concur.