QUIRK, APPELLANT, *v.* RICH, RESPONDENT.

(No. 2,778.)

(Submitted February 24, 1910.   Decided March 2, 1910.)

[107 Pac. 821.]

*Contracts—Construction—Findings—Equity    Cases—Review—*
*Water Rights—Extent of Rights Under Contract.*

Written Contracts—Construction.
1.   In construing a written contract, the intention of the parties must be ascertained, in the first instance, by reference to the language employed by them, giving the words their ordinary meaning; and where the language is clear, certain and unambiguous, interpretation may not be resorted to.

Findings—Equity Cases—Review.
2.   Where the record in an equity case discloses substantial testimony to support the findings, they will not be disturbed on appeal.

Water Rights—Contract—Extent of Rights of Parties.
3.   Where the rights of persons to the use of the water of a stream for irrigation, in certain quantities and at certain times, are not based on their original appropriations, but on a contract between themselves, neither is entitled to increase his irrigated acreage after the date of the contract so as to use more water than he was actually, beneficially, and necessarily using at the time of making the contract.

*Appeal from District Court, Flathead County; J. E. Erickson, Judge.*

ACTION by Thomas Quirk against George Rich.   There was a decree substantially for defendant.   From an order denying a new trial, plaintiff appeals.   Reversed and remanded.

*Mr. W. H. Poorman, Mr. W. N. Noffsinger,* and *Mr. Hans Walchli* submitted a brief in behalf of Appellant.   *Mr. Noffsinger* argued the cause orally.

The instrument on which the defendant bases his claim in the trial court is not a conveyance of any water right or of any water.   Differing in this respect from the contract considered by this court in *Middle Creek Ditch Co.* v. *Henry,* 15 Mont. 558, 39 Pac. 1054, it is merely an agreement for the use of water under appropriations.   Hence, it cannot have any greater effect than to make the use of the water in the irrigation of his land

by defendant, prior in point of time to use by plaintiff. The plaintiff, notwithstanding the contract or agreement, would still have the right to use the surplus water not required for the irrigation of defendant's lands, for this agreement nowhere waives the right in plaintiff to the use of this surplus. (Revised Codes, sec. 4844; *Toohey* v. *Campbell,* 24 Mont. 13, 60 Pac. 396; *Power* v. *Switzer,* 21 Mont. 523, 55 Pac. 32.)

Rich could not, by the contract or otherwise, acquire title to the *corpus* of the water, but only to the usufruct thereof. (*Norman* v. *Corbley,* 32 Mont. 195, 79 Pac. 1059.)

With the rules prescribed for the proper interpretation of contracts of this character, by sections 5025, 5029, 7873 and 7877, in view, we desire to call the court's attention to the following rules and authorities: Where a contract is ambiguous, contradictory or obscure in its language, and capable of two interpretations, it must be given that construction which inclines most nearly to common sense and justice. (*Coghlan* v. *Stetson,* 19 Fed. 727.) To ascertain intent it is permissible to look at result. (*Williams* v. *Glover,* 66 Ala. 189.) The court will adopt even a strained construction of the language of a contract to prevent obvious injustice. (*Robinson* v. *Stow,* 39 Ill. 568.) Interpretation will lean to the rendering which will make the contract reasonable and just. (Bishop on Contracts, sec. 400; *Dederick* v. *Wolfe,* 68 Miss. 500, 24 Am. St. Rep. 283, 9 South. 350.) Relief will not be denied merely because there is a conflict in the evidence upon the question of mistake. (*Hutchinson* v. *Ainsworth,* 73 Cal. 452, 2 Am. St. Rep. 823, 15 Pac. 82.)

The total amount of land owned by Rich at the time this agreement was entered into was one hundred and sixty acres. There is no evidence as to the number of acres "actually and necessarily irrigated" or that can be irrigated. Yet by the judgment and decree the defendant Rich is given unlimited and absolute jurisdiction and control over all of these waters including the surplus, without any limitation, whatsoever, and the plaintiff is perpetually enjoined from in any manner interfering with this decreed right in defendant. There is neither fact nor

law on which to base this judgment, and the judgment is against law on the facts presented, and a new trial should have been granted. (*Parrott* v. *Thatcher*, 9 Pick. (Mass.) 426; 29 Cyc. 818, 819.)

There was a brief on behalf of Respondent, by *Messrs. McIntire & Kendall. Mr. B. J. McIntire* argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

This action was begun on January 9, 1906. It appears from the complaint that on April 17, 1889, one Frank Derosier appropriated 200 inches of the waters of a certain stream "known under the name of Edwards creek or Chief creek, and is now known as Edwards creek, alias Chief creek, alias Derosier creek"; and that prior to the first day of May, 1887, the plaintiff appropriated "from the waters of said Edwards creek, alias Chief creek, alias Derosier creek 200 miners' inches of the waters of said Edwards creek." The plaintiff is now the owner of both of said water rights. He alleges that the defendant claims some right in and to the waters, which right is subject and subsequent to that of the plaintiff. The defendant answered, denying substantially all of the allegations of the complaint, on information and belief, and setting forth affirmatively that on the thirtieth day of October, 1892, he appropriated 200 inches of the waters of Derosier creek, "otherwise known as Edwards creek, Chief creek and Dry creek, which creek is the same creek as that mentioned in the complaint," for the purpose of irrigating his land. It is further alleged in the answer that on the nineteenth day of June, 1896, the plaintiff Quirk began an action against the defendant for the purpose of determining their respective rights in the waters of Edwards creek, and that, "for the purpose of forever settling all differences and contentions of the parties to said suit in regard to the waters of Edwards creek," they entered into an agreement by which the defendant released to the plaintiff his right to the use of the waters theretofore appropriated by him, during the month of

June of each and every year, for and in consideration of plaintiff releasing and granting to him (Rich) the right to the use of all of the waters of Edwards creek, otherwise known as Derosier creek, Chief creek and Dry creek, during all other months of every year. The plaintiff by reply alleged that a creek known as Dry creek is a tributary of Edwards creek; that the defendant's appropriation applied solely to Dry creek and not to Edwards creek; that the purpose of the action brought in 1896 was not to determine the rights of the parties in and to Edwards creek, but solely to determine their rights in Dry creek; "that the waters of Edwards creek were not contemplated by said suit; that defendant Rich had never, prior to the nineteenth day of June, 1896, diverted or appropriated any of the waters of Edwards creek proper, but had diverted certain of the waters of Dry creek; that plaintiff's attorney, in drawing the complaint in said suit, in terms included the waters of Edwards creek, but that the intention thereof was merely to litigate defendant's and plaintiff's respective rights in and to the waters of Dry creek." Plaintiff admits that he executed the agreement set out in the answer, and alleges that the purpose of said instrument was to settle the differences and contentions of the parties in regard to the waters of Dry creek, and that the intention of the parties was that said Thomas Quirk should yield up the waters of Dry creek to George Rich during eleven months of each and every year, the defendant yielding up to plaintiff the right to the use and possession of all the waters of Dry creek during the month of June of each year, and that said contract was not intended to in any way relate to the waters of the main stream, to-wit, to any of the waters of Edwards creek; that the plaintiff believed that defendant understood that the agreement related and applied only to the waters of Dry creek; that the description given in said agreement was and is erroneous; that the words "to the use and possession of the waters of Edwards creek, otherwise known as Dry creek and Chief creek, and Derosier creek" were inserted by mutual mistake of the parties to the agreement, instead of the words, "to the use and posses-

sion of the waters of what is known as Dry creek, a tributary of Edwards creek, otherwise known as Chief creek and Derosier creek," which should have been used instead thereof. The plaintiff then prays that the designation of the creek mentioned in said agreement be modified and amended so as to conform to the intention of the parties.

The cause was tried to the district court of Flathead county sitting with a jury. The following special findings were returned:

"(1) At the time of the commencement of this action did plaintiff have the right to use, by appropriation or otherwise, any of the waters of Edwards creek? Answer: Yes.

"(2) If you answer the last question in the affirmative, you may state how many inches? Answer: 160 inches.

"(3) On the twenty-sixth day of June, 1896, did the plaintiff have the right to use any of the waters of Edwards creek? Answer: Yes.

"(4) If you answer the last question in the affirmative, you may state how many inches? Answer: 130 inches.

"(5) On the twenty-sixth day of June, 1896, did the defendant, George Rich, have the right to the use of any waters that in any way reached the point where plaintiff took his waters from Edwards Creek? Answer: Yes.

"(6) If you answer the last question in the affirmative, you may state how many inches? Answer: Eighty inches.

"(7) If you answer the fifth question in the affirmative, you may state from what water or creek the said defendant owned said water? Answer: Edwards creek, alias Chief creek, alias Derosier creek, and tributaries known as Dry creek.

"(8) At the time the plaintiff and defendant entered into a contract, you may state whether or not they were contracting relative to the water of Edwards creek, or the branches thereof known as Dry creek? Answer: Both Edwards creek and Dry creek.

"(9) At the time the parties entered into the contract did they intend the contract to apply to Dry creek only, or did

they intend that it should apply to Edwards creek proper and Dry creek? Answer: Edwards creek proper and Dry creek.

"(10) How many inches of the waters of Dry creek was the defendant entitled to at the time of the commencement of this action? Answer: 100 inches.

"(11) If you answer the previous question, that the defendant was entitled to the use of a certain number of inches of the waters of Dry creek at the time of the commencement of this action, you may state whether or not his right thereto was superior or subject to the rights of the plaintiff thereto? Answer: Subject.

"(12) Have the plaintiff and defendant acted upon and complied with the terms of the agreement as set forth in defendant's answer since the execution thereof? Answer: Plaintiff has not. Defendant has.

"(13) Did the defendant understand the written agreement as set forth in his answer, according to the terms thereof? Answer: Yes.

"(14) Did the plaintiff understand the agreement set forth in defendant's answer, according to the terms thereof? Answer: Yes."

The court, over objection of the plaintiff, entered a decree which, after reciting the proceedings had, continues: "The court being duly advised in the premises, it is hereby ordered, adjudged and decreed that the said plaintiff, Thomas Quirk, is entitled to the prior right as against the defendant, George Rich, to the use of all of the waters of Edwards creek and Dry creek during the month of June of each and every year; that the defendant, George Rich, is entitled to the prior right, as against the plaintiff, Thomas Quirk, to the use of all of the waters of Edwards creek and Dry creek except during the month of June of each and every year." The parties are then enjoined from interfering with each other in the rights decreed. The plaintiff has appealed from an order denying him a new trial.

There is some suggestion in the brief of counsel for the appellant that the contract in question involves a latent ambiguity.

But it seems to us that the sole question presented, aside from
the scope of the decree, is whether the contract, through mistake,
fails to express the real intention of the parties.     Section 5025,
Revised Codes, is called to our attention.     That section reads as
follows: "A contract must be so interpreted as to give effect to
the mutual intention of the parties as it existed at the time of
contracting, so far as the same is ascertainable and lawful."
However, this section simply means that the intention of the
parties shall be ascertained in the first instance by reference
to the language employed by them.     Where the words used
are clear, certain, and unambiguous, interpretation may not be
resorted to.     The language employed must be given its ordinary
meaning.     (2 Page on Contracts, sec. 1104; Revised Codes, sec.
5027.)     We find nothing uncertain about this contract.     It reads,
as follows:

"This agreement made and concluded this twenty-sixth day
of June, 1896, between Thomas Quirk, the party of the first
part, and George Rich, the party of the second part, both of
Tobacco Plains, Montana, Witnesseth:

"Whereas, a suit at law has been begun and a complaint filed
in the district court of the eleventh judicial district of the state
of Montana, for the county of Flathead, by the party of the
first part against the party of the second part, to determine
the respective rights of the parties hereto, to the use and pos-
session of the waters of Edwards creek, otherwise known as Dry
creek, and Chief creek and Derosier creek, in Flathead county,.
Montana, and fully described in said complaint:

"Now, in consideration of the second party yielding up the
possession and use of all said waters described above, and in first
party's complaint, to the party of the first part, during the
month of June, 1896, and during every month of June each and
every year hereafter, said first party hereby agrees to dismiss
the said suit so commenced in said district court and to yield
up to said second party the use and possession of all said waters
aforesaid during the entire year of 1896 and each and every

year hereafter, except during the said month of June, 1896, and the months of June in each and every year hereafter.

"And the second party hereto, in consideration of first party yielding up the use and possession of all said waters aforesaid during the whole of each and every year beginning with the year 1896, to the party of the second part, except during said months of June, hereby agrees to yield up to first party all the waters aforesaid, during said month of June, 1896, and for each and every month of June hereafter.

"It being the intention of the parties hereto that the first party has the right to the use and possession of all the waters aforesaid during the entire months of June beginning June, 1896, and second party has the right to the use and possession of all the waters aforesaid for the entire year beginning with the year 1896, except during the month of June. And this agreement is intended to be perpetual and binds the parties hereto, their heirs, executors, administrators and assigns.

"Witness our hands and seals this 26th of June, 1896, in duplicate.

"THOMAS QUIRK.    [Seal.]

"GEORGE RICH.    [Seal.]"

In the complaint filed on June 19, 1906, the plaintiff alleged that he was entitled to use 200 inches of "Edwards creek, alias Chief creek, alias Derosier creek," and that the defendant had wrongfully and unlawfully "diverted the water of said creek from the said ditches by means of another ditch which intersected said Edwards creek." The relief prayed for was that the defendant be enjoined from in any manner "diverting the said waters of said Edwards creek, alias Chief creek, alias Derosier creek."

J. B. Gibson, a civil engineer, testified for the plaintiff that "Dry creek is usually dry in June, July, August, September and October, and all the rest of the year except in excessive rains."

The defendant testified: "I was never interfered with in the use of water as originally appropriated from what is denomi-

nated as Dry creek until the complaint and injunction ·was ·served on me. The suit was dismissed. I used water continuously as I needed it in every month of June of each year, ·and then turned it over to Mr. Quirk, and have not used the water any year during the month of June since the execution ·of the agreement, but have used the water during the remainder ·of the time under the agreement. Mr. Quirk brought a suit against me in 1896, in June, I think. Papers were served on ·me on the 19th or 20th. I met Mr. Quirk by the side of the road :and spoke to him about the suit, and he says, 'Are you going to force a man into a lawsuit?' and says, 'You don't have to go to law yet,' and I says, 'It looks like it,' and that is the way. I says to him, 'You have water enough running in here—what ·do you want—you have enough if you stop those places to support a lake instead of a ranch,' and he says, 'I have very hard land to irrigate, and when I irrigate I want to use lots of water; I expect to raise timothy, and it takes lots of water'; and further ·on—we were not in the best of humor all the time—and he made ·the remark he was going to raise timothy, and if I would give him full use of the water for irrigation, I could have all the water, and then we commenced talking the matter over to get to ·a settlement. I was willing to do anything to keep out of a lawsuit. I was a poor man, and I asked Mr. Quirk how long it ·would take him to irrigate with having all the water, and it was some time before he gave me any answer, and quite a while; ·and he says it was three weeks, and I says, 'I will go you'; he ·says, 'I have been to quite a little expense coming down and looking up this thing, and I want you to stand part of the expense,' and I says, 'That is a case of your own getting up, and ·you will have to make it pretty light'; and· he says, 'If you will allow me fifteen dollars,' and I agreed to that; and he says, 'Lindsay is somewhat of a lawyer,' and agreed to meet me there the next day and have this thing drawn up in proper shape and be through with our troubles; and we met there, and the ·only trouble we had was he changed his mind, and I tried to persuade him he ought to stay with what he agreed; and

he said no papers had been signed, and I finally remarked that we better get Mr. Lindsay, he might change his mind again, and we got Lindsay to draw up the agreement as it stands there. When the agreements were made we were both present and talked it over, and Lindsay wrote it down and read it over to the satisfaction of both of us, and he says, 'I want a copy of this in better form. You fellows drop in and sign, and then each take one.' I can't remember the exact date; but some time after he called my attention to it, and says, 'Quirk has signed, and you better sign and each take one'; and I did go in and sign two, and one of them is here. I don't know what Quirk done with his; I put mine on record. Mr. Quirk in his conversation said, 'All the water.' Q. Was there any conversation except about the water you were taking out of Dry Creek? A. Yes, sir; he said all the water. Q. He said you could have the water the rest of the year, and he would take it during the month of June; that was all that was said about it? A. Yes; if a man gives me all, I won't ask for any more. My understanding of the contract was that the contract applied to both streams. I could not say what Mr. Quirk thought about it, whether he thought it applied to both streams or only to one; all you can go by is what he says; it is hard for me to say what his idea was. I understood the agreement between myself and Quirk as the agreement shows, and I have claimed ever since its execution the same as to-day. June is the strong month with the stream. I have no waters valuable for irrigation providing I am confined to the waters of Dry creek and dispossessed of this during the month of June.''

J. F. Duffy, an attorney at law, testified: ''At the time of the commencement of this (1896) action, I examined the records, but don't distinctly remember examining the location notice of George Rich. I took my information from my client, and at the time made copies and notes of the action.''

C. H. Foot, also an attorney for the plaintiff in the 1896 action, testified: ''Mr. Duffy was uncertain as to the true name

of the water of the creek in litigation, and for that reason I used the language in the complaint: 'Derosier creek, otherwise Chief creek, Edwards creek, otherwise Dry creek.' The situation was uncertain, and the complaint was drawn hurriedly and hastily in order to get out an injunction. I don't know whether there was a mistake or not; I can't say at this time. I know nothing about that."

Maurice Quirk, a brother of the plaintiff, testified that he heard a conversation between the parties subsequent to the first conversation had between them. He said: "There appeared to be a dispute between them as to how long they should have the water of Dry creek. George Rich would give the water of Dry creek during the month of June, except a week, and that seemed to be the difference between them." This conversation was denied by Rich.

The plaintiff testified: "I remember entering into the agreement with Mr. Rich. I heard his testimony. It is a good deal as Mr. Rich stated. I commenced an action. This Dry creek was the cause of the lawsuit. After the commencement of the action, Mr. Rich came to me and asked me if we couldn't settle the matter out of court, and I told him we could, and we talked the matter over once in particular; the first time we spoke of it down in the field, and I made a proposition and he made one. I proposed if he would allow me the waters during the month of June, I could go over the ground pretty well with it during that time, and I would allow him the water before and after for the balance of the year; and he tried to get me to allow him the use of the water in the first week of June, or the last week of June, and I wouldn't consent to that, and it hung fire with my kind of objection to that proposition for a while, and a few days after we spoke of the matter again. Maurice was present the second time we spoke of it, and it was about drawing up a contract, and we decided on the terms. It was one agreement from first to last, and we entered into the agreement as we started out: that I should use the waters during the whole month of June, and he was to take them the balance of the

season, and went down in a day or two afterward and signed
a contract to that effect. I believe Lindsay had the contract
prepared when I went there. There were two contracts written.
Mr. Rich went to see Lindsay, and I guess we all agreed on Mr.
Lindsay to do the writing for us. It was the waters of Dry
creek. There was no others talked—Edwards creek or any of
them. Rich had nothing to do with Edwards creek or any
other. They are some distance apart. I don't remember who
took the waters of Dry creek during the remainder of that
month. After the first of July, Rich kept them, and I had the
waters of Dry creek during the month of June, and Rich had it
the balance of the year of every year since then. It was some
time after getting to this contract that Rich commenced the
new ditch. I did not speak to him about it when he first started.
I spoke to him after I came to see counsel about it. He gave
me to understand that he wouldn't do any further work on the
ditch, and he quit right there, and he didn't do any more work
on the ditch for seven or eight years afterward. At that time
I told him I would have to commence litigation if he went on
with the ditch. There was nothing left undecided about the
contract. We came to an understanding about it then. Lind-
say's store is about seven or eight miles from my place, and I
guess we talked it over a little more there. At the first con-
versation in the field that I had with Rich, he wanted me to use
the waters up there for three weeks. He tried to make that kind
of an agreement, but I wouldn't stand for it. I wouldn't agree
to take the waters at any time, to accept the waters for three
weeks. I always held out from the first. We both agreed on
Mr. Lindsay to write the contract, and he did it. I read and
write the English language. He took some notes of it and
wanted to draw it up in its present shape, so it was not signed
that day. He had a written copy of it, and I believe we signed
that; and he told us he would write the second copy in better
shape, would draw up a second agreement, and we could sign
that later on, which we did. I don't remember whether Mr.
Rich was there when I signed the contract or not. I don't re-

member of seeing him. I signed the contract first, then went back in a day or two and got a copy of it. I was supposed to get a copy of it, but I didn't. I believe I got a copy of the first copy, and I had it, or it was lost or destroyed several years ago. I didn't remember how it read, but I know how it reads, it reads like this one. I didn't make a second trip to Lindsay's. We agreed on the terms before we left him, and I don't think we made a second trip. The waters I used for irrigation purposes are those of Edwards creek, Chief creek, and Derosier creek and Dry creek, and the waters that come into Edwards creek from Dry creek. This creek is known as Dry creek for the reason that it usually goes dry the latter part of the summer. There is usually plenty of water there in June, and it generally goes dry the latter part of the summer season.''

The jury found that at the time the parties entered into the contract they intended that the same should apply to Edwards creek proper as well as to Dry creek, and that they were contracting relative to the waters of both Edwards creek and Dry Creek. We think there is substantial testimony upon which to base these findings. While it is apparent from the record that in June, 1896, the defendant had no rights in the waters of either Dry creek or the main stream, which were not subsequent in point of time to those of plaintiff, still it must be remembered that the parties were engaged in litigation, and that, if what Rich says is true, the plaintiff was very anxious to insure himself the use of all the waters of the stream. While it is true that Gibson testifies that Dry creek carries no water in June, this is probably a mistake, for the reason that both the parties to the action testify, in effect, that June is one of the high-water months on the creek, if not the month when the same carries the greatest volume of water. There is no question, under the testimony, that the plaintiff was anxious to have all of the waters of Dry creek during the month of June; and it also appears that the defendant contributed toward the cost of the 1896 lawsuit. On the part of the defendant it is strenuously insisted that the fact that the plaintiff sought in 1896 to

quiet his title to the stream called "Edwards creek," "Derosier creek," "Chief creek," or "Dry creek," is significant. On the other hand, the plaintiff claims that there was no reason why he should release all claims to the waters of the main stream, because, as he says, Rich never claimed any interest in those waters. But we cannot undertake to say what motives may have actuated the plaintiff when he signed the contract. As a matter of fact, he never positively claimed that he did not know its contents. Both parties seem to have agreed upon Mr. Lindsay to draw it up; the plaintiff could read and write the English language, and his own testimony discloses the fact that he signed it some days after the first draft was made, at a time when defendant was not present; and it is not to be supposed that he was influenced in executing it, by any other consideration than that he fully agreed to its terms. He may have misapprehended its legal effect; but so far as we are able to judge from the testimony the jury and court were amply justified in finding, as they did in effect, that the contract as written expresses the real intention of the parties. Under these circumstances we may not disturb the findings. (See *Watkins* v. *Watkins,* 39 Mont. 367, 102 Pac. 860; *Pope* v. *Alexander,* 36 Mont. 82, 92 Pac. 203; *Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze,* 32 Mont. 354, 80 Pac. 918.)

It is contended, on the part of appellant, that the decree is too broad, in that it prevents him from using any of the waters of Edwards creek during eleven months of the year. We think his position in this regard is well taken. Confessedly, the defendant bases his claim to the use of any of the waters of the main stream, not upon his original appropriation of the waters of Dry creek or upon any subsequent appropriation, but upon the contract of June 26th. This being true, we are clearly of opinion that the contract must be construed with reference to the situation of the parties at the time. We do not think that either party will be justified in claiming that he had a right, by virtue of the contract, to increase his acreage after the date thereof, so as to use more water than he was actually, beneficially

and necessarily using at the time of the agreement. What has just been said does not relate to the rights of the parties under their appropriations. Each has the undoubted right, as against the other, to the use of the surplus waters after the other has completed his necessary irrigation. We construe the agreement to mean that the plaintiff may use all of the waters of the main stream and its tributaries, as against the defendant, during the entire month of June, to the extent that he was actually, beneficially and necessarily using the same in June, 1896, and that during the balance of the year the defendant has the same right. Neither, under the contract, may claim a right to increase his irrigated acreage, as he might do under an appropriation. Whatever rights either party has to irrigate more land than he had under cultivation in 1896 must be by virtue of a prior or subsequent appropriation, and not under the contract. The jury found that at the time of the commencement of this action the plaintiff had the right to use 160 inches of the waters, and that on the 26th of June, 1896, he had the right of the use of 130 inches. They also found that on the 26th of June, 1896, the defendant had a right to use 80 inches of the waters, and that at the time of the commencement of this action he was entitled to use 100 inches. The testimony upon the question of the number of acres of land actually, beneficially and necessarily being irrigated by the respective parties at the time of the agreement, is meager and unsatisfactory. The findings on that point are without substantial support in the evidence. We gather from reading the record that this question was not a prominent feature at the trial. We deem it advisable, therefore, to reverse the order denying a new trial, and remand the cause to the district court, with directions to take further testimony on that question alone, and to then enter a decree in accordance with the views herein expressed. Each party will pay his own costs in this court.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.