COCANOUGHER, APPELLANT, v. ZEIGLER, RESPONDENT.

(No. 8,124.)

(Submitted March 19, 1941. Decided May 1, 1941.)

[112 Pac. (2d) 1058.]

*Mr. M. J. Doepker,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. Philip C. Duncan,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This action is one in which the plaintiff seeks to condemn a right-of-way through an irrigation ditch on defendant's land for the purpose of conveying water for irrigation to land of the plaintiff adjoining that of the defendant. The ditch in question arises in a slough adjacent to the Big Hole River. The testimony is that it follows closely along the edge of the slough for some little distance and then passes through the defendant's land, and that it is now used solely by the defendant. There is testimony that the ditch extends on to part of plain-

tiff's land but that the ditch has been unused there for a number of years. Judgment in the lower court was for the defendant.

The allegations of the plaintiff's complaint are that he has no other practical means by which to convey water to his land; that because of the terrain and the present location of defendant's ditch the construction of a paralleling ditch would cost so much that, as he put it, it would be worth more than the land which he seeks to irrigate. The testimony indicates, by reason of the fact that the defendant irrigates directly from the ditch in question, that unless that ditch may be used jointly it would be necessary for the plaintiff to build a ditch on each side of the present ditch for defendant's use and that to water his land he would have to use the present ditch. The testimony of the defendant's own witnesses is that the construction of some other means of conveying water rather than by joint use of the present ditch after its enlargement to plaintiff's land would be prohibitive in cost.

The court's judgment is based on its findings that the enlargement and joint use of the ditch in question would result in destroying the defendant's use of it and that it would result in appropriating and taking away the property now appropriated to a public use for another public use not more necessary than the first, under the provisions of subdivision 3 of section 9936, Revised Codes, which provides that private property appropriated to a public use may be taken by eminent domain ''but such property must not be taken unless for a more necessary public use than that to which it has already been appropriated.''

Aside from these two matters, the proof is ample to support plaintiff's complaint and there seems no question that except for these two objections plaintiff should have been granted the relief sought.

Is there substantial evidence in the record to support the finding that the enlargement of the ditch ''will result in totally destroying or materially impairing and interfering with defend-

ant's use thereof   *  *  *   to his great and irreparable damage''?

At the outset, there can be no question that mere inconvenience to defendant or some damage which may be compensated for by plaintiff is not sufficient ground upon which to deny plaintiff's prayer. (20 C. J. 605.) Plaintiff, by his petition, states he is willing to pay any damage to defendant plus the cost of enlarging the ditch.

What is the testimony that enlarging the ditch will destroy it? The theory that its enlargement would destroy it is based on the fact that defendant irrigates directly from it through some thirty-three taps and several laterals and that to divert the water through these outlets he uses a canvas or dirt dam. The testimony is that enlarging the ditch, together with its joint use, will make impossible irrigation from it by defendant by the use of these means of diverting the water through the taps. Plaintiff's witnesses testify that boxes could be placed at intervals which would raise the water sufficiently to divert it through these taps and laterals and still permit sufficient water for plaintiff's use to go by. Metlen, the engineer who testified for defendant, when questioned about this plan said diversion by this method was ''perfectly possible but the question is whether it would be practical.'' He then said it was a method commonly used. His objection to the practicability of the joint use of the ditch after enlargement and construction of the headgates was that ''it would probably wind up in trouble,'' but that would depend on whether or not the headgates were so constructed and so arranged as to permit plaintiff's water to go through while defendant was irrigating. He does not testify that they could not be constructed and so arranged. He further testified that because there was not much fall in the ditch, it might be possible to irrigate out of several of the taps at once from the water backed up from one box. In other words, it would not be necessary to install a box or headgate for each tap or lateral.

The witness Fisher, called by defendant, says enlarging the ditch would make the use of the canvas and dirt dams impossible. He stated that the box and headgate system could possibly be used satisfactorily, but that in times when the water was low, putting a board in the box to raise the water level "would consume all the water there was at the time for irrigation." But no other witness suggests this result, and this statement is obviously an opinion of the witness and there is no testimony of facts to support it. He, too, was concerned over the possibility of future trouble where two took out of the same ditch. He testified that while he rented defendant's place, a tenant on plaintiff's place irrigated a small tract from this ditch and they had had "not a particle" of trouble. There is other evidence showing that in the past, but without defendant's permission, defendant says, a part of plaintiff's land was irrigated through his ditch and an extension of it on plaintiff's land.

Defendant's testimony will not support the finding. His statements are that it would injure him in "a good many different ways" and the use of the ditch by plaintiff would "in a way * * * have an effect on me and in another way * * * I do not think I could keep a renter on the place." He stated as his opinion that "it would be awful hard to * * * with any satisfaction" irrigate his land from the enlarged ditch by use of the boxes suggested, as the water had to be taken out from so many different places.

The other testimony which is relied upon to show irreparable damage to support the findings is that there are low spots on defendant's land which might, because of increased seepage which would occur because of the disturbance of the bottom and sides of the ditch in its enlargement, become water logged and sour.

Metlen testified: "It might fill up some of those pot holes in there. I don't think it would have very much effect on the land after the increase in the capacity of the ditch was made." Defendant stated that the seepage "would fill up a lot of those little pot holes in a way different than it would from my ditch,"

and that there would be more seepage and that "in a way it would" swamp the land "where the water stood the year around mostly," but he does not know whether there would be such places. There is no evidence as to the number or size of these pot holes or their present value or the extent of the damage; however, defendant's testimony indicates they are few and small since the seepage would affect by souring "in a way * * * places right around my buildings in there."

The testimony of plaintiff's witnesses that a feasible plan of installing headgates could be worked out so as to permit both to use the ditch is corroborated by defendant's witnesses. It is apparent from the testimony that defendant's use of the ditch will not be totally destroyed. The evidence shows that he may suffer some inconvenience but it shows no more than that. It is a well known fact in Montana that a great many, if not most, supply ditches are used jointly by two or more ranchers. And, of course, some inconvenience naturally follows, but to hold mere inconvenience, even though substantial, sufficient to deny plaintiff's petition would destroy to a large extent the public policy of Montana encouraging the extension of the irrigation of our arid lands.

There is evidence on the part of both plaintiff and defendant that joint use of a supply ditch is common in Beaverhead county, and that ordinarily no trouble arises by reason of that joint use, particularly in the locality where the land in question lies.

The next question that arises concerns the legal question of whether or not, as a matter of law, one may condemn a right-of-way through a ditch on another's land where the ditch is being used to irrigate the latter's land. Defendant invokes subdivision 3 of section 9936, Revised Codes. Under this subdivision the real question is: Will the taking of this private property, already dedicated to one public use, destroy the prior public use? Or, in other words, will the enlargement and joint use of the ditch in question result in destroying or materially injuring the defendant's right to the use of the ditch? That subdivision can only apply where there is a taking of the prop-

erty dedicated to a public use and appropriating it to another public use. The implication is clear that the legislature had in mind in enacting that subdivision, when it speaks of a more necessary public use than that to which the property is already dedicated, that the latter use is such as will destroy the prior use. That not being the case, subdivision 3 does not inhibit the condemnation here sought.

Appellant urges that subdivision 5 of that section contemplates this situation and under it he should prevail if not otherwise. Subdivision 5 provides: "All rights-of-way for any and all the purposes mentioned in section 9934, and any and all structures and improvements thereon, and the lands held and used in connection therewith must be subject to be connected with, crossed, or intersected by any other right-of-way of improvements, or structures thereon. They must also be subject to a limited use, in common with the owner thereof, when necessary; but such uses, crossings, intersections, and connections must be made in manner most compatible with the greatest public benefit and least private injury."

That this subdivision contemplates irrigation ditches is shown by the specific reference to section 9934. That section defines public uses and subdivision 3 includes irrigation ditches. This court has had before it these sections of the statute on various occasions.

In the case of *State ex rel. Butte-Los Angeles Mining Co. v. District Court,* 103 Mont. 30, 60 Pac. (2d) 380, 383, this court, speaking through Mr. Justice Morris, held that a mining company could not condemn an *exclusive* right of way through another's tunnel where the tunnel was already being used for the same purpose for which the condemnation was sought. The opinion indicates that the reason for refusing to allow the acquisition of the tunnel for a second public use was that the petition sought to make the second use exclusive and so destroy the first, the court saying: "We find no case where property is in use for a particular purpose by one party, either as owner or otherwise, in which any court has given another an exclusive

right under the right of eminent domain to the same property. Defendant has cited a number of cases where land has been acquired and used by one party under the right of eminent domain and courts have granted to others a right in the same property where the new right did not materially conflict with the enjoyment of the older right. (*Butte, Anaconda & Pacific Ry. Co.* v. *Montana Union Ry. Co.*, 16 Mont. 504, 41 Pac. 232, 31 L. R. A. 298, 50 Am. St. Rep. 508; *Amador Queen Min. Co.* v. *Dewitt*, 73 Cal. 482, 15 Pac. 74; *Marsh Min. Co.* v. *Inland Empire Mining & Milling Co.*, 30 Idaho, 1, 165 Pac. 1128; *Monetaire Mining Co.* v. *Columbus Rexall Consolidated Mines Co.*, 53 Utah, 413, 174 Pac. 172.) In the *Idaho Case*, supra, it was said: 'The aid of eminent domain is extended to the industry [mining] not to the individual.' We do not think that the plaintiff below has shown any sufficient grounds to justify the court in granting it the exclusive right to use the 51 feet of the tunnel running through the Lee claim.'' Sections 9934 and 9936 apply to mining tunnels as well as to irrigation ditches.

In the *Monetaire Mining Co.* v. *Columbus, etc.*, case cited by this court above, plaintiffs sought to condemn a right to use a certain mine tunnel in common with the defendant. The provisions of the Utah Code are identical with subdivisions 3 and 5 of section 9936, and the court held that the relief sought should have been granted, saying: ''It is contended that under Comp. Laws 1907, section 3590, subd. 3, property devoted to a public use can only be taken under the eminent domain statute 'for a more necessary public use' than the one for which it is appropriated. That no doubt is the law, and, so far as we know, is generally enforced in this country. It must also be conceded that the use appellant seeks to make of the tunnel in question is not a more necessary use than the one respondent is making of it. Appellant, therefore, cannot succeed under the clause of the statute last referred to. What appellant seeks is not to appropriate respondent's tunnel and to dispossess the latter of its property rights therein or of its use, but what appellant seeks is to condemn the right to use the tunnel in common with the

respondent; that is, to condemn the unused capacity of the tunnel. Where property is condemned for a more necessary use, the original condemner is deprived of his ownership and use. Such is not the case, however, where a second right to use the property or right of way is one in common with the present owner thereof. This distinction must be clearly kept in mind, and, if it is, no confusion can arise.''

In another of the cases cited by this court in that opinion, *Marsh Mining Co.* v. *Inland Empire Min. & Milling Co.*, 30 Idaho, 1, 165 Pac. 1128, 1129, the court said: ''Property devoted to, or held for, a public use is subject to the power of eminent domain if the right to so take it is given by constitutional provision or legislative enactment, in express terms or by clear implication, but it cannot be taken to be used in the same manner and for the same purpose to which it is already being applied, or for which it is, in good faith, being held, *if by so doing that purpose will be defeated.* * * * The purposes having been specified in sections 3223 and 3224, supra, for which property dedicated to mining may be appropriated, it follows that, unless it is being applied by its owner to, or in good faith held for, the same or a more necessary public use, *which will be defeated or seriously interfered with thereby,* it may be taken in aid of that industry under the power of eminent domain for one or more of these designated purposes and none other. * * * '' (See, also, Lewis on Eminent Domain, 3rd Ed., sec. 440.) In 20 C. J. 600, the rule is stated thus: ''In other jurisdictions it is a statutory requirement that the second appropriation shall be for a 'more necessary public use.' But such requirement refers to a proceeding to dispossess the owner of his property and deprive him of its use altogether, and does not preclude condemnation for a joint use which will not interfere with the use thereof by the owner.''

The evidence and the law not supporting the findings on which the judgment is based, and the record showing that the relief sought by the plaintiff should have been granted, the judgment

is reversed and the cause remanded with directions to proceed as here indicated.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN and ANDERSON concur.

MR. JUSTICE MORRIS: I dissent. This is an equity case, and is governed by these long established rules:

(1) The credibility of the witnesses and the weight of their testimony is exclusively for the trial court. (*Bowen* v. *Webb,* 37 Mont. 479, 97 Pac. 839; *Consolidated Gold & S. Min. Co.* v. *Struthers,* 41 Mont. 551, 111 Pac. 150; *Blinn* v. *Hutterische Soc.,* 58 Mont. 542, 194 Pac. 140; *Orton* v. *Bender,* 43 Mont. 263, 115 Pac. 406; *Parchen* v. *Chessman,* 53 Mont. 430, 164 Pac. 531; *Dockins* v. *Dockins,* 82 Mont. 218, 266 Pac. 398; *Piersky* v. *Hocking,* 88 Mont. 358, 292 Pac. 725; *Wallace* v. *Wallace,* 85 Mont. 492, 279 Pac. 374, 66 A. L. R. 587; *Rentfro* v. *Dettwiler,* 95 Mont. 391, 26 Pac. (2d) 992, and many others.)

(2) The supreme court will not reverse the findings of the district court in equity cases, except where the evidence clearly preponderates against them. (*Story* v. *Black,* 5 Mont. 26, 1 Pac. 1, 51 Am. Rep. 37; *Budd* v. *Perkins,* 6 Mont. 223, 9 Pac. 916; *Francisco* v. *Benepe,* 6 Mont. 243, 11 Pac. 637; *Noyes* v. *Ross,* 23 Mont. 425, 59 Pac. 367, 47 L. R. A. 400, 75 Am. St. Rep. 543; *Slater Brick Co.* v. *Shackleton,* 30 Mont. 390, 76 Pac. 805; *Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6; *Nichols* v. *Williams,* 38 Mont. 552, 100 Pac. 969; *Watkins* v. *Watkins,* 39 Mont. 367, 102 Pac. 860; *Copper Mountain Min. & Smelting Co.* v. *Butte & Corbin Consol. C. & S. Min. Co.,* 39 Mont. 487, 104 Pac. 540, 133 Am. St. Rep. 595; *In re Noyes' Estate,* 40 Mont. 178, 105 Pac. 1013; *Quirk* v. *Rich,* 40 Mont. 552, 107 Pac. 821; *Kelly* v. *Granite Bi-Metallic Consol. Min. Co.,* 41 Mont. 1, 108 Pac. 785; *Murray* v. *Butte-Monitor Tunnel Min. Co.,* 41 Mont. 449, 110 Pac. 497, 112 Pac. 1132; *Kift* v. *Mason,* 42 Mont. 232, 112 Pac. 392; *Boyd* v. *Huffine,* 44 Mont. 306, 120 Pac. 228; *Winslow* v. *Dundom,* 46 Mont. 71, 125 Pac. 136; *Orton* v. *Bender,* supra;

*Street* v. *Delta Mining Co.,* 42 Mont. 371, 112 Pac. 701; *Waldorf* v. *Phillips,* 42 Mont. 80, 111 Pac. 546.)

(3) Findings of fact by a trial court based on conflicting evidence will not be disturbed on appeal. (*Ming* v. *Truett,* 1 Mont. 322; *Reardon* v. *Patterson,* 19 Mont. 231, 47 Pac. 956; *Anderson* v. *Cook,* 25 Mont. 330, 64 Pac. 873; *Wetzstein* v. *Largey,* 27 Mont. 212, 70 Pac. 717; *Stevens* v. *Curran,* 28 Mont. 366, 72 Pac. 753; *Phillips* v. *Coburn,* 28 Mont. 45, 72 Pac. 291; *Hennessy* v. *Kennedy Furniture Co.,* 30 Mont. 264, 76 Pac. 291; *Landeau* v. *Frazier,* 30 Mont. 267, 76 Pac. 290; *Reid* v. *Hennessy Mercantile Co.,* 45 Mont. 383, 123 Pac. 397; *Finlen* v. *Heinze,* 32 Mont. 354, 80 Pac. 918; *Gazette Printing Co.* v. *McConnell,* 45 Mont. 89, 122 Pac. 561, Ann. Cas. 1913C, 1327; *Delmoe* v. *Long,* 35 Mont. 139, 88 Pac. 778; *Gehlert* v. *Quinn,* 35 Mont. 451, 90 Pac. 168, 119 Am. St. Rep. 864; *Pope* v. *Alexander,* 36 Mont. 82, 92 Pac. 203, 565; *Alywin* v. *Morley,* 41 Mont. 191, 108 Pac. 778; *Williard* v. *Campbell Oil Co.,* 77 Mont. 30, 248 Pac. 219; *Portland Cattle Loan Co.* v. *Featherly,* 74 Mont. 531, 241 Pac. 322; *Nelson* v. *Wilson,* 81 Mont. 560, 264 Pac. 679; *Commercial Bank & Trust Co.* v. *Jordan,* 85 Mont. 375, 278 Pac. 832, 65 A. L. R. 968; *Fousek* v. *DeForest,* 90 Mont. 448, 4 Pac. (2d) 472.

The reason for this rule is forcibly set out in *Pope* v. *Alexander,* supra. Mr. Chief Justice Brantly, speaking for the court on motion for rehearing, said: "Though the evidence is presented in question and answer, it is in cold type, without the gestures, behavior, or appearance of the witnesses, and often, as in this case, the illustrations made by them through the medium of maps, diagrams, and other instrumentalities used to make their statements intelligible. It would be manifestly out of place for this court to undertake to try a case and determine it as does the district court. * * * In a given case what is not clear and convincing to us as might be might have been entirely so to the trial judge. At least this presumption attaches to his findings, and this court is not at liberty to overturn

them unless there is a clear preponderance against them
\* \* \*

"If we assign the meaning to this testimony which counsel insist that it should have, we should certainly agree with them, and say that the judgment should be reversed. The presumption must obtain, however, that it was understood by the trial court as lending support to defendants' case, and hence that it tended to support the findings as made. Are we justified in saying that it was not clear and convincing to him?"

The trial judge whose decision is under review here came to the bench after many years at the bar in a district wherein water right litigation has been a frequent and varied cause of court actions, and he brings to the bench a broad experience in, and long familiarity with water right laws, the practical application of water to the land, and the varied problems with which water users have to contend. In addition to such experience, the trial judge viewed the premises and the ditches and then found that the changes in defendant's ditch necessary to comply with plaintiff's demand "will result in totally destroying or materially impairing and interfering with defendant's use thereof for the irrigation of his said lands, to his great and irreparable damage." Employing the substance of Mr. Chief Justice Brantly's language quoted above, are we justified in saying that the learned trial judge did not grasp the import of his finding heretofore quoted?

The foregoing decisions and others which adhere to the rule that the trial court's findings must be upheld in equity cases unless there is a preponderence of the evidence to the contrary, may be said to be modified to the extent mentioned in *Piersky* v. *Hocking*, 88 Mont. 358, 359, 370, 292 Pac. 725, 728, where Mr. Justice Ford, speaking for the court, said, "While it is true that in equity cases this court will go no further than to determine whether there is a preponderance in the evidence against the findings of the lower court, it is equally true that the trial court may not disregard uncontradicted credible evidence," citing cases. This holding, in my opinion, does not differ mate-

rially from the general rule laid down by the numerous cases cited above.

Having cited the general rule relative to this court's powers of review in equity cases, attention is now directed to the wording of the statutes relative to taking private property for public use under the right of eminent domain. This court said in *State ex rel. McMaster* v. *District Court*, 80 Mont. 228, 260 Pac. 134, 135: "The right to take private property from its owner against his will can only be invoked pursuant to law, and there must always be a rigorous compliance with its provisions when this right is sought to be exercised (*Glass* v. *Basin Mining & Concentrating Co.*, 22 Mont. 151, 55 Pac. 1047; *City of Helena* v. *Rogan*, 26 Mont. 452, 68 Pac. 798), and authority for the exercise of such right must be clearly expressed in the law before it will be allowed (*State ex rel. McLeod* v. *District Court*, supra [80 Mont. 228, 260 Pac. 134]; 1 Elliott on Roads and Streets, 4th Ed., sec. 218, p. 263)."

Section 9936 provides: "The private property which may be taken under this chapter includes: * * * · 3. Property appropriated to public use; but such property must not be taken unless for a more necessary public use than that to which it has already been appropriated; * * * ."

Section 9937 provides: "Before property can be taken, it must appear:

"1. That the use to which it is to be applied is a use authorized by law.

"2. That the taking is necessary to such use.

"3. If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use. * * * "

What does "more necessary," mean when it is applied to determine the merit of plaintiff's demand that he be given, under the right of eminent domain, a joint right with the defendant in the use of the latter's ditch?

Webster's International Dictionary, 2nd Ed., gives a number of definitions, each appropriate to the particular use of the word,

but it is clear that the manner of its use here is defined by Webster as, "A greater quantity, amount or number; that which exceeds or surpasses what it is compared with."

The meaning of the phrase "more or less," frequently used in instruments of conveyance, is readily grasped by the mind. Such a phrase means just what it says and needs no construction. "More" means greater; "less" means a smaller number or amount. Section 15, Revised Codes, provides in part, "Words and phrases used in the codes or other statutes of Montana are construed according to the context and approved usage of the language." This rule is to be adhered to except only when words or phrases have acquired a peculiar meaning. No peculiar meaning can be attributed to the phrase "a more necessary use," nor to the word "more" as used in sections 9936 and 9937. The words need no construction.

In *Montana Central Ry. Co.* v. *Helena & R. M. R. Co.*, 6 Mont. 416, 12 Pac. 916, 922, the controversy was on the right of one railroad to condemn, under the right of eminent domain, a right of way through a canyon and over the right of way of another railway already in use by the first. After reviewing the evidence, it was found that the relator or plaintiff had not shown necessity for a right of way over the respondent's right of way, and the court then said "that when such necessity does appear, and there is a failure to agree upon the terms of occupancy, the matters in dispute shall be adjusted by the district court of the county where the canyon, pass, or defile is situate, upon equitable terms." This early decision means, of course, that an appeal may be had to the higher court but, in the first instance the "necessity" of the second right of way along a particular line which the one already occupying the way, objects to, shall be determined by the district court, the trier of facts in such cases. This holding is in accord with the rules heretofore mentioned defining the scope of this court's powers to review the findings of a trial judge.

Attention is called to sections 9370 and 9371, Revised Codes, which read:

"9370. In cases of exceptions for defective findings, the particular point or issue upon which the party requires a finding to be made, or the particular defect to be remedied, shall be specifically and particularly designated; and upon failure of the court to remedy the alleged defect, the party moving shall be entitled to his exceptions, and the same shall be settled by the judge as in other cases."

"9371. Such exceptions shall be filed in the court and served on the attorney of the adverse party within five days after receiving from or giving to the adverse party a written notice of the filing of the findings."

Plaintiff's general objection to the ruling of the court was not in accord with the specific requirements of these statutes. This court in *Joyce* v. *McDonald*, 51 Mont. 163, 149 Pac. 953, 954, speaking through Mr. Justice Sanner, said: "This cause, moreover, was tried to the court sitting without a jury, and in such a case the trial court cannot be put in error for failure to make findings not requested (Rev. Codes, sec. 6766), nor for defective findings not specially excepted to (Rev. Codes, sec. 6767). The record nowhere discloses any request for findings, nor any exceptions to those which were filed." · Mr. Chief Justice Brantly and Mr. Justice Holloway concurred. The rules of procedure provided by statutes are enacted to be observed, not ignored.

I think the correct rule to be applied here is clearly laid down by the Circuit Court of Appeals of the United States for the Ninth Circuit in the case of *Oregon Short Line R. Co.* v. *Postal Telegraph, etc., Co.,* 111 Fed. 842, 843, where it had under consideration the case as appealed from the southern division of the United States District Court for Idaho, reported in 104 Fed. 623. In outlining what was presented to the lower court, the Circuit Court used this language:

"The defendant in error instituted condemnation proceedings to condemn to its use, as a right-of-way for the purpose of constructing and maintaining a telegraph line, a portion of the right of way of the plaintiff in error used and occupied by it

for its railroad, extending longitudinally along the line of the railroad through Idaho from the boundary line of Montana, a distance of about 200 miles. In its complaint the defendant in error alleges that the land which it seeks to occupy will be one circular foot 5 feet deep for each pole to be erected; that it will not attach its wires or fixtures to any of the bridges or structures of the railroad company, and will not erect any of its poles upon any embankment of the company, but will occupy only such portion of the right-of-way as is not necessary for the use of the railroad company; and promises that, if at any time the railroad company shall need any portion of its right-of-way where the poles and lines of the telegraph company are situated, the latter will, upon notice, at its own expense remove its poles and wires from such part of the right of way. Upon issue joined and the testimony adduced, the court rendered judgment in favor of the defendant in error, finding that the use to which it proposed to put the property is a public use, authorized by law, and necessary for its use, and a more necessary public use than that to which it was already appropriated, and that the construction and operation of said telegraph line would not diminish the value of the right of way of the railroad company for railroad purposes. Damages were awarded the plaintiff in error in the sum of $500.''

Further along in the body of the opinion, on page 846 of 111 Federal, after reviewing numerous statutory provisions in the various states on the question of condemnation of a right of way for a public use of private property under the right of eminent domain, where the way had already been appropriated by another for a public use, it was said: ''To authorize a second condemnation of such properties to a second use which is subversive of the first, there must be express legislative authority. [Citing a number of cases.]'' The court then quotes from a Minnesota case [*Northwestern Tel. Exch. Co.* v. *Chicago, M. & St. P. R. Co.*, 76 Minn. 334, 79 N. W. 315] as follows: '' 'The general rule is that express legislative authority is generally requisite except where the proposed appropriation would not destroy or

greatly injure the franchise, or render it difficult to prosecute the object of the franchise, when a general grant would be sufficient. Land already devoted to another public use cannot be taken under general laws, when the effect would be to extinguish a franchise. If, however, the taking would not materially injure the prior holder, the condemnation may be sustained.' ''

It will be noted that the Circuit Court of Appeals emphasizes both in the body of its opinion and in its quotations from other jurisdictions the strong disapproval of granting a second right, such as is involved in the case at bar, where the second right would ''destroy or greatly injure'' the prior right.

This same question is frequently referred to in 20 C. J. under its treatment of the subject of ''Eminent Domain.'' In section 88, page 598, it is said in part: ''While property condemned for a particular public use or purpose cannot, unless the fee has been taken, be devoted to a different use or purpose, the rule is well established that property previously devoted to one public use may be taken under the power of eminent domain for another and different public use. * * * The rule is subject, however, to the limitation that property devoted to public use cannot be taken to be used for the same purpose in the same manner, as this would amount simply to the taking of property from one and giving it to another without any benefit or advantage whatever to the public. Where there is no change in the use it becomes a matter of mere private concern without at all affecting the public interest.''

On page 602 of 20 C. J., section 90, it is said: ''Property already devoted to a public use cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication, mere general authority to exercise the power of eminent domain being in such case insufficient.''

I think that it is quite obvious on a review of the findings of the district court in the case at bar that the trial judge must

have rather carefully reviewed Corpus Juris on eminent domain. I think the phrase "materially impair or interfere with the former use," is very important in the case at bar, and from the evidence it clearly appears that the trial judge was convinced that defendant's ditch and premises would be destroyed or materially impaired if plaintiff's demand was granted.

The majority quote at some length from the case of *State ex rel. Butte-Los Angeles Mining Co.* v. *District Court,* 103 Mont. 30, 60 Pac. (2d) 380, 385, a case in which the opinion was written by me.

If the majority had read the opinion in its entirety possibly the rule laid down in the case would have been discovered and understood. The court's conclusion in that case is expressed in the following language:

"We assume that this decision will not terminate the controversy, and in the event other proceedings may bring the matter here, we will state that neither party to this action could, by any proceeding under the provisions of the statutes relating to eminent domain, acquire, in our opinion, the exclusive right to the use of that part of the tunnel located on the ground of the other, for the very simple reason that both parties contend they are using, or intend to use, the tunnel *for the same purpose; consequently, neither can say his purpose is more useful than the other.*"

That opinion is in accord with the plain meaning of the "more necessary public use" clause of sections 9936 and 9937, Revised Codes; the opinion in the instant case is not.