REID, APPELLANT, *v.* HENNESSY MERCANTILE CO.,
RESPONDENT.

(No. 3,115.)

(Submitted April 10, 1912.  Decided April 15, 1912.)

[123 Pac. 397.]

*Fraudulent   Conveyances — Evidence—Weight—Equity—Findings—Conclusiveness.*

Equity—Findings—Conclusiveness.
1.   The court on appeal in an equity case will not disturb the findings of the trial court, unless there is a decided preponderance in the evidence against them, and where the testimony, fairly considered, accompanied by the presumption that the findings are supported by the evidence, furnishes reasonable grounds for different conclusions, the findings will not be disturbed.

Same—Fraudulent Conveyances—Fraud—Evidence.
2.   The fraud which will vitiate a conveyance need not be proved by direct evidence, and while the fact of relationship between the parties to the transaction attacked may cast suspicion thereon and lend credence to the claim that it was the result of collusion between the parties to defraud creditors, it alone does not establish fraud.

Same—Evidence—Weight.
3.   The trial court, in a suit in equity, in weighing the testimony may consider the appearance and demeanor of the witnesses and their interest in the transaction, and it may disbelieve witnesses giving improbable and inconsistent testimony relative to a transaction in which they are pecuniarily interested, though they are not directly contradicted.

Same—Evidence—Sufficiency.
4.   Evidence *held* to support a finding that a conveyance by a mother to her son was in fraud of her creditors.

*Appeal from District Court, Silver Bow County; John B. McClernan, Judge.*

ACTION by James Reid against the Hennessy Mercantile Company.  From a judgment for defendant and an order denying him a new trial, plaintiff appeals.  Affirmed.

*Mr. Alexander Markel* submitted a brief in behalf of Appellant, and argued the cause orally.

In behalf of Respondent, *Messrs. Nolan & Donovan* submitted a brief; *Mr. T. F. Nolan* argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

This action was brought to quiet the title to a certain piece of real estate in Butte. On September 2, 1908, Patrick Reid conveyed the property to his wife, Winifred, and on June 22, 1909, Winifred Reid conveyed it to the plaintiff, James Reid, who is her son. On the latter date Winifred Reid was indebted to the defendant in the sum of $1,021.90. On July 22, 1909, an action was commenced on this account and a writ of attachment issued. On August 24, 1909, judgment was entered, and the real estate in controversy was sold to the defendant in partial satisfaction thereof, by the sheriff, upon execution. As a defense to the action, the defendant alleged that the transfer from Winifred Reid to the plaintiff was made "with intent to hinder, delay, and defraud her creditors, including defendant; that said grantee had knowledge of the grantor's circumstances and knew of her indebtedness to the defendant and of her fraudulent intent and participated in the scheme to hinder, delay, and defraud her creditors; that said transfer was made without consideration, was fraudulent and void, and was made for the purpose of preventing the defendant from collecting its indebtedness against Winifred Reid." This allegation was put in issue by a reply. Said reply also set forth affirmatively that for many years prior to September 2, 1908, plaintiff earned considerable sums of money, which he gave to his parents, Patrick Reid and Winifred Reid, "and during all of said times they promised and told this plaintiff that the property described in the complaint belonged to and should become the property of this plaintiff; that during the year 1908 Patrick Reid, father of this plaintiff, died; that prior to the death of said Patrick Reid, to-wit, on the second day of September, 1908, the said Patrick Reid, for the purpose of fulfilling the said promise and agreement to this plaintiff, executed and delivered a deed to the said property to Winifred Reid, with the understanding and agreement that the said Winifred Reid was to hold the said property in trust, and to hold the same as trustee of and for this plaintiff; and that Winifred Reid, in pursuance of said agreement and in ful-

fillment of the wish and desire of said Patrick Reid, did on the twenty-second day of June, 1909, make, execute, and deliver to this plaintiff a deed to the said property, and at all times mentioned in the answer plaintiff was and now is the owner, in possession and entitled to the possession of the property.'' The cause was tried to the district court, Hon. John B. McClernan, judge presiding, without a jury. Plaintiff appeals from a judgment in favor of the defendant and from an order denying a new trial.

C. J. Kelly, manager of the Hennessy Mercantile Company, called as a witness by the defendant, which assumed the burden of proof, testified in part as follows: ''Along in May, 1909, we called Mrs. Reid to the office and told her that the account was entirely too large; that she would have to either secure the account or pay it; her failure to do either would mean that we would bring suit. She said it would be paid; that she had lots of money; that she owned the property and we were not taking any chances. My knowledge then was that she owned this property. She said she would make a large payment on account immediately after the June pay days. That, of course, she failed to do, and later in the month we had to close the account entirely. The June pay days came about the 15th. For many years prior to that time she also, as payment on the account, turned in the checks of her son, James Reid, and they were always applied on the account.''

Mrs. Reid testified: ''I got the title to this property, No. 833 North Montana street, a couple of days before Mr. Reid died. Him and I was talking to each other. Of course, we knew he was going to die, and he didn't want to let it go through the court. He said, 'You can fix that with the boy,' because if it went through the court it would cost more money. He just told me to deed that over to Jimmie when he would demand it. He said he would give it to me and I could do as I liked with it. He says when the boy would demand the house, to give it to him, because he promised him the house since he was twelve years old if he would be a good boy, and he was a good boy; every

dollar he earned he brought in to help raise the family. He was twenty-one in April, 1908, and his father died in September, 1908. Jimmie was seventeen when Mr. Reid bought the property. No one was present when I had this conversation I spoke of. I got No. 833 and also No. 835 North Montana street by a deed made by Mr. Canning. I kept this property in controversy in my name until June, 1909, because he never demanded it. Mr. Kelly knew I had the property. I guess that's why they carried me so much, but I hadn't it. Jimmie had the property, and his father, too. I guess Jimmie knew I had an open account at Hennessy's. Some time in July, 1909, I homesteaded the other place I was living in, the 24th of July. My husband transferred everything to me to give it to James when he demanded it. James was of age when my husband died. I don't know why he didn't transfer it to James. I was present when my husband said to James, 'Now, if you will be a good boy and help me raise those little girls, this will be your house.' He said that the house would be his when he would be twenty-one, so he could go and sit on the jury. Jimmie said, 'Yes, I'll bring you every dollar I earn.' So he did; every dollar he earned went to Hennessy's. He gave over $4,700, every dollar by virtue of this agreement. I testified once before that I guessed it was $2,700. I didn't know how much he gave. The house was worth $1,500. James didn't demand the house in April, when he was twenty-one. I testified once before: 'My husband deeded everything over to me to do what was right with the children, so I did; I done what he requested me.' I paid $42 taxes on the property in November, 1909, but it was my son's payment. I guess James paid seven years' work for the house. No, I don't think he paid seven. I might make a mistake; I don't know. He paid me about seven; from the time he was seventeen until he was twenty-one he paid me. I rented the house in June, 1909, to Thomas Brunsdon, for James, who was at work."

James Reid, sworn for the defendant: "I was between fifteen and sixteen when this agreement with my father was made, in January, 1903. He simply said that if I would turn over my

check and help him raise the family, why, that the house would be mine when I was twenty-one. I says, 'All right.' It was a little after 6 o'clock in the evening—broad daylight. I was never allowed to control my own earnings. Father never said I could keep the money I earned myself. I paid about $4,900 under that agreement.''

It appears from the foregoing and other testimony in the record—construing the same as favorably as possible for the appellant—that on a day in January, 1903, a little after 6 o'clock in the evening, when it was broad daylight, Patrick Reid informed his son James, in the hearing of Winifred Reid, his wife, that if the son would turn over his pay checks and thus assist in raising the other children, the house and lot would be his when he arrived at the age of twenty-one years. No one else was present. James fully performed his part of the agreement and paid in about $4,900 for property of the value of from $1,500 to $1,800. Although James became of age in April, 1908, he did not demand title to the property at that time or at any time prior to the death of his father; on the contrary, he paid into the family exchequer the sum of $710 in the year 1908 after he became twenty-one years old, and between $400 and $500 in the year 1909, prior to June 22. He attempted to explain the payment of $710 by saying that he agreed with his father to make certain repairs on the house. These repairs cost about $450. He also declared that he voluntarily made payments to his mother after the death of his father for the purpose of assisting her and sending his sister to school. On or about September 2, 1908, Patrick Reid, who was about to die, transferred the property and one other house and lot to his wife. Immediately prior to the transfer he had told her to "fix it up with the boy," to deed the house over to Jimmie "when he would demand it.'' He said he would give it to her, and she could do what she liked with it; that he had promised Jimmie the house "since he was twelve years old.'' It appears from the testimony of the appellant, however, that he was almost sixteen years old when the alleged agreement was made.

No third person was present at the time of the conversation between husband and wife. On September 3, 1908, Patrick Reid died, and Mrs. Reid continued to hold the title to both pieces of property until some time in May or June, 1909, when Mr. Kelly demanded payment of her account with the Hennessy Mercantile Company, and informed her that, if she did not pay or secure it, suit would be instituted against her. She agreed to make a large payment on or about June 15. Instead of doing so, however, she transferred the house and lot No. 833 to her son, on June 22. On July 22 suit was begun, and two days later she filed a declaration of homestead on house and lot No. 835.

Bearing in mind that this is an equity case and the burden of proving fraud in the transfer from Winifred Reid to James Reid was assumed by the respondent, the only question for decision is, Does the record show a decided preponderance [1] in the evidence against the decision of the trial court? This court said, in *Watkins* v. *Watkins*, 39 Mont. 367, 102 Pac. 860: "In reviewing the evidence the court will start oat with the presumption * * * that the findings are supported by the evidence. It will then endeavor by a fair, unprejudiced, and dispassionate examination of the evidence, to determine whether there is any substantial support for the findings, always bearing in mind that it is not assisted by the presence of the witnesses, and that a witness' manner and demeanor on the stand might justify a conclusion not at all warranted by a review of the evidence reduced to cold print. If, acting under the guidance of the rule here laid down, we determine that the testimony furnishes reasonable grounds for different conclusions, then we will hold that there is no decided preponderance against the findings and decline to disturb them."

In *Merchants' Nat. Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250, Mr. Justice De Witt, speaking for the court, said: "Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in direct [2] lines. It goes in devious ways. We may with difficulty know

'whence it cometh and whither it goeth.' It 'loves darkness rather than light because its deeds are evil.' It is rarely that we can lay our hands upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course.''

Mr. Moore, in his treatise on Fraudulent Conveyances and Creditors' Remedies (volume 2, page 964), says: ''The mere fact of relationship between the parties to a transaction which is prejudicial to the interests of creditors does not establish fraud. * * * It is held by the weight of authority, however, that the fact of relationship may cast suspicion on the transaction and lend credence to the claim that it was the result of a conspiracy by or collusion between the parties thereto to defraud creditors, since relations may be presumed to be on terms of intimacy, and to have a natural and strong motive to protect each other at the expense of creditors, and more likely than other persons to lend aid to each other in case of pecuniary difficulty.''

A trial court is not bound to believe all the testimony that it hears. The appearance and demeanor of the witnesses, their manner of testifying, and the probability or improbability of the [3] truth of their statements are all to be considered in connection with the other facts and circumstances in the case. When the statements of witnesses, although positive, and not directly contradicted by other witnesses, are improbable, contradictory, and inconsistent in themselves, when they relate to alleged transactions with persons who by death or absence are unable to dispute them, when the witnesses are directly and pecuniarily interested in the result of the controversy, and their testimony may furnish the basis for a recovery in their favor, and the attendant circumstances are such as to cast suspicion upon the entire transaction as narrated by them, the court may disbelieve such witness and disregard their testimony. (See *Poor* v. *Madison River P. Co.*, 38 Mont. 341, 99 Pac. 947.)

Judge McClernan was evidently of opinion that no such agreement with Patrick Reid as that narrated by his wife and son [4] was ever had, that the transfer from Winifred Reid to

the appellant was fraudulent and without consideration, and that the latter knowingly participated in the fraud. We find no decided preponderance in the evidence against his decision. The judgment and order are therefore affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.