SPRATT, Appellant, *v.* PFEIFLE et al., Respondents.

(No. 8388.)

(Submitted April 8, 1943. Decided October 15, 1943.)

[142 Pac. (2d) 563.]

*Mr. G. G. Harris,* for Appellant, 

*Messrs. Swanberg & Swanberg,* for Respondents, 

MR. JUSTICE MORRIS delivered the opinion of the court.

The plaintiff, acting under authority vested in him as the surviving trustee under a will, entered into a contract with the defendant, Conrad Pfeifle, by which the plaintiff agreed to sell to the defendant a quarter section of land in Cascade county for $4,000. The contract provided for a small cash payment on the execution of the contract and for subsequent annual payments running over a period of years. The defendant defaulted in the payment of some of the installments, and also defaulted in the payment of taxes on the land which under the contract he was required to pay. The quarter section that the defendant had contracted to purchase from the plaintiff was known as the Cameron land and adjoined another 160 acres of land that belonged to the defendant's wife located in the same section. The two tracts will hereafter be referred to as the Cameron land and the wife's land. When the defendant defaulted in the payments and allowed the taxes thereon to become delinquent, M. J. Breen, engaged in the real estate and insurance business in Great Falls, acting as the agent of the plaintiff in all matters relating to the contract of sale, endeavored to obtain additional security from

the defendant for the purchase price of the Cameron land and to effectuate that purpose prepared a mortgage covering the Cameron land and the additional quarter section belonging to the wife. The defendant signed the mortgage but the wife refused to sign. When this action was brought the wife was made a defendant with her husband but she disclaimed any interest in the matter and was dismissed as a party to the litigation.

When Breen was unsuccessful in getting the defendant and his wife to sign a mortgage on the Cameron land combined with the wife's quarter section, he advised the defendant that he would be compelled to take some action to protect the plaintiff's interests. He thereupon took a quitclaim deed from the defendant for the Cameron land and entered into a lease contract with the defendant in April, 1933, by which the land was leased to the defendant for two years. Such contract contained this provision: "It is agreed and understood between the parties hereto, that Second Party held a certain 'Contract for deed' to the above premises, but that he is in default as to payments of interest and principal, for several years, and that there is also delinquent taxes on said lands. He agrees to deliver to First Parties all the crops raised on said lands for 1933 and 1934, free of expense to First Party, and said proceeds shall be applied towards payment of taxes, delinquent and current, first, and then on back interest and principal. He has surrendered the premises back, by way of quitclaim deed, dated December 15th, 1932, to First Parties. If, at the expiration of this lease, Second Party shall have made payments as to taxes, interest, and principal, satisfactory to First Parties, contract will be restored and reinstated."

The lease contract also contained these further provisions:

"Right of Sale. First party shall have the right to sell said premises or any part thereof at any time, and second party agrees that in case of sale he will immediately on notice and demand, quietly and peacefully remove his entire property from the premises sold; provided that in case of such sale to some third party, after the crop is planted in any year, second party is to have the right upon promptly and fully performing his part of

this agreement to harvest and receive from said premises the portion of all crops he may have acquired thereon per this agreement, and to occupy the buildings if same are included in this contract, until he can have had such share of said crop harvested and threshed but not later than November 1st of said year in any event; and shall be paid for any summer fallowing that he may have done and upon which he may not have had an opportunity of raising a crop (such summer fallowing being his and the grain not yet planted), at the 'going rate' per acre for each acre well summer fallowed.''

''Termination. The term of this agreement commences with the date hereof and ends without notice on November 1st, 1934, unless sooner terminated as herein provided for.

''Vacate Premises. Second party agrees at the termination of this agreement he will at once remove his entire property from the premises peacefully and without notice or process of law. Where second party does not immediately remove from said premises as herein provided, his continuing to remain thereon shall not be construed as renewing this contract or giving him any rights hereunder, and it is particularly agreed that this contract cannot be renewed or in any manner modified except by writing endorsed and signed hereon by both parties hereto.''

The principal contentions of the respective parties are, first, plaintiff contends that the provisions relative to the revival of the contract of sale by reason of the things that were done by the respective parties subsequent to that agreement revived the contract of sale, the plaintiff's right to bring this action being predicated upon such revival; and the defendant on the other hand contends that the execution and delivery of the quitclaim deed rescinded the contract of sale and that there was no revival of the contract; that after the quitclaim deed was executed and delivered the defendant had no interest in the Cameron land except as a lessee. It appears by the testimony of Breen that he kept possession of the quitclaim deed for an indefinite period of time and then, assuming that it was of no further value, he threw it away but did not advise the defendant of such act.

Breen's destroying the deed without notice or consultation with the other party to the deed is characteristic of his arbitrary attitude toward the defendant in the many transactions between the two mentioned in the record.

Plaintiff's prayer for relief is, first, that he have judgment for the balance due on the contract, with interest thereon, and certain expenses, and, second, sets out a prayer in the nature of a demand for a decree quieting title.

Defendant's demurrer to the complaint was overruled and Dorothy F. Pfeifle, wife of the defendant, having answered denying any interest whatever in the subject matter of the controversy, she appears no further in the litigation.

The defendant's answer is a general denial, followed by certain affirmative defenses. The first is to the effect that there was an oral agreement between the defendant and Breen by which the defendant would release all of his interest in the Cameron land in full satisfaction of his obligations under the contract, and he alleges that the contract of purchase was fully and finally determined by the quitclaim of December 15, 1932, subject only to being revived according to the provision in the lease contract relative thereto, and that said lease contract provided for its own termination on November 1, 1934, by this express provision therein: ''It is particularly agreed that this contract cannot be renewed or in any manner modified except by writing endorsed hereon and signed by both parties hereto;'' that no such writing was ever added to the contract, and therefore it terminated on November 1, 1934, and that any and all acts thereafter done by the defendant relating to farming or performing any other work or act in relation to the Cameron land were done and performed as lessee of the land and in no other capacity. By reason of its lack of merit we deem it unnecessary to consider the second affirmative defense.

The action, being one in equity, was tried by the court sitting without a jury. The court's findings and conclusions of law were as follows:

"Findings of Fact

"I. That on or about the 15th day of November, 1928, the above named plaintiff and defendant Conrad Pfeifle duly and regularly entered into a certain contract by the terms of which plaintiff agreed to sell, and defendant agreed to purchase, the following described land: Lots one (1) and two (2), and the East Half of the Northwest Quarter (E½ NW¼) of Section Eighteen (18) in Township twenty-two (22) North of Range One (1) East of the Montana Meridian, Montana.

"II. That thereafter the said defendant became in default under the terms of the said contract and on or about the 15th day of December, 1932, the said defendant, Conrad Pfeifle executed and delivered a quitclaim deed to plaintiff covering the premises described above; and thereafter plaintiff entered into possession of said premises and leased the same to defendant Conrad Pfeifle for a period of two years which said lease contained a provision to the effect that the premises could be sold to the defendant herein or to anyone else, and said lease expired in 1934 and was not thereafter renewed.

"III. That the original contract has not been revived in writing since the said 15th day of December, 1932, nor renewed by any agreement between the parties.

"Conclusions of Law.

"I. That defendants have no interest of any nature whatsoever in the said premises either at the present time or at the time suit herein was commenced and the original contract for the purchase of the said land was completely terminated and rescinded by the giving of the quitclaim deed hereinabove mentioned, together with the lease of the premises as hereinabove set out."

A careful reading of the transcript clearly shows that the defendant Conrad Pfeifle was very illiterate, that he could not read the English language and could write only to the extent of signing his own name; and it is further clearly obvious that in no transaction had between the defendant and Breen did Pfeifle exercise any judgment of his own, but did what Breen told him

to do and fully depended on Breen for advice as to the contents of the various instruments he signed from time to time at Breen's demand. Pfeifle's testimony is consistent throughout to the effect that in signing the Halcro lease he thought that he was simply signing a lease for the 160 acres which his wife owned and did not know that the written lease covered both the land owned by his wife and that contracted for. He testified that when he gave the quitclaim deed he thought he was through with the Cameron land, and it is very obvious that when he later turned over everything that he raised on the land to Breen, after paying certain expenses, he believed that any other acts he did relative to the Cameron land were obligations arising out of the contract of purchase that were his duty to discharge; and that still later when he summer-fallowed the land one year and then allowed it to be put in crop by the party who had a lease on his wife's quarter section, without receiving any compensation for such labor, he obviously did this work to mollify Breen and appease him so that he would "let me alone once."

We have given more time to recounting the facts and our conclusions therefrom than is really necessary. This being an equity case we proceed under the rule that the findings of fact of the trial court were correct. This court has repeatedly held in a long line of decisions that it will not reverse the findings of the district court in equity cases except when the evidence clearly preponderates against them, and that the findings of fact of a district court, based upon conflicting evidence, will not be disturbed on appeal. (*Ming* v. *Truett*, 1 Mont. 322; *Reardon* v. *Patterson*, 19 Mont. 231, 47 Pac. 956; *Anderson* v. *Cook*, 25 Mont. 330, 64 Pac. 873, 65 Pac. 113; *Wetzstein* v. *Largey*, 27 Mont. 212, 70 Pac. 717; *Phillips* v. *Coburn*, 28 Mont. 45, 72 Pac. 291; *Stevens* v. *Curran*, 28 Mont. 366, 72 Pac. 753; *Hennessy* v. *Kennedy Furniture Co.*, 30 Mont. 264, 76 Pac. 291; *Landeau* v. *Frazier*, 30 Mont. 267, 76 Pac. 290; *Reid* v. *Hennessy Mercantile Co.*, 45 Mont. 383, 123 Pac. 397; *Finlen* v. *Heinze*, 32 Mont. 354, 80 Pac. 918; *Gazette Printing Co.* v. *McConnell*, 45 Mont. 89, 122 Pac. 561, Ann. Cas. 1913C, 1327; *Delmoe* v. *Long*, 35 Mont.

139, 88 Pac. 778; *Gehlert* v. *Quinn,* 35 Mont. 451, 90 Pac. 168, 119 Am. St. Rep. 864; *Pope* v. *Alexander,* 36 Mont. 82, 92 Pac. 203, 565; *Alywin* v. *Morley,* 41 Mont. 191, 108 Pac. 778.

A resume of this rule and cases cited in support thereof is set out with emphasis in the case of *Sanger* v. *Huguenel,* 65 Mont. 236, 242, 211 Pac. 349, 350, where it is said: ''The witnesses herein appeared before the trial judge and testified. He heard what each of them said, and saw how or the manner in which they said it. He observed their general appearance while testifying, their candor or lack of candor, their fairness or lack of fairness, and in arriving at its conclusions, the trial court also had before it the printed record of what was said by each of these witnesses. This court has before it only the printed record. Obviously the trial court is in a much better position to pass judgment upon the evidence than is this court; therefore, the rule, frequently announced by this court that the findings of the trial court will not be disturbed, unless the evidence clearly preponderates against such findings. (*Bosanatz* v. *Ostronich,* 57 Mont. 197, 187 Pac. 1009; *Boyd* v. *Huffine,* 44 Mont. 306, 120 Pac. 228; *Winslow* v. *Dundom,* 46 Mont. 71, 125 Pac. 136; *Noyes Estate* v. *Granite-Alaska Co.,* 64 Mont. 406, 210 Pac. 96.)'' The rule is adverted to with emphasis in *Alywin* v. *Morley,* supra, *Reid* v. *Hennessy Mercantile Co.,* supra, and *Winslow* v. *Dundom,* supra; and see *In re Wray's Estate,* 93 Mont. 525, 535, 19 Pac. (2d) 1051.

It is well understood and conceded by this court and all others that the trial judge is in a much more favorable position to judge of the credibility of the testimony given by witnesses on the witness stand in his presence than this court, and out of that generally recognized rule arises the rule which is supported by numerous decisions that we have hereinabove cited: That where the evidence received in an equity case is conflicting, this court will not set aside a decree of the trial court where there is substantial evidence to support it. The testimony in the instant case is in sharp conflict but, in our judgment, there is no preponderance in favor of the plaintiff, and hence, in accordance with the rule, the judgment must stand.

The judgment is affirmed.

ASSOCIATE JUSTICES ERICKSON, ANDERSON and ADAIR concur.

MR. CHIEF JUSTICE JOHNSON, dissenting:

I cannot agree with the majority opinion, which, it seems to me, gives too little effect to pleadings, evidence and law, and while I deplore long opinions, whether majority or minority ones, the circumstances necessitate a more complete statement of all three elements than the decision contains.

Plaintiff sued to foreclose a vendor's lien, and appeals from an adverse judgment rendered by the district judge after trial without a jury. The only remedy sought was against Conrad Pfeifle, the sole purchaser under the contract sued upon (hereinafter called the defendant), except that his wife was joined also to foreclose any interest she might have in the land. She answered disclaiming any interest.

The complaint set forth the contract and alleged that upon its execution defendant entered into possession of the land and ever since had had possession thereof; that defendant had defaulted in the payment of taxes, interest and principal; that plaintiff and his predecessors in interest had fully performed the contract; that on April 4, 1933, while defendant was in default, a written contract was made by which the land was leased to defendant for the crop years of 1933-1934 and defendant agreed to deliver to plaintiff all crops raised, the proceeds to be applied first upon taxes, delinquent and current, and second upon accrued interest and principal; that it was further agreed that if, at the expiration of the lease, payments satisfactory to the trustees had been made the "contract will be restored and reinstated;" that defendant did make satisfactory payments and the contract for deed was therefore reinstated; that plaintiff elected to enforce the contract and was ready to deliver a deed to defendant upon payment of the balance due.

The answer admitted the contract and the defaults, but alleged that on December 15, 1932, defendant had quitclaimed the property, that the contract was thereupon terminated, and that about

three months later he entered into a new agreement with plaintiff which "was a lease of said land with the provision that under certain terms and conditions the previous contract could be revived and reinstated and * * * that the said original contract was never revived or reinstated." Thus the answer affirmatively pleaded that the second agreement was more than a lease and related to the reinstatement of the original agreement, but pleaded the conclusion that the latter was never reinstated thereunder.

As a first affirmative defense, defendant alleged that an oral agreement was made by the parties by which defendant was to release and quitclaim all his interest in the premises "in full satisfaction of all obligations under the said contract" and was to receive a lease "with the privilege of reviving said contract to purchase;" that the quitclaim deed of December 15, 1932, and the agreement of April 4, 1933, were made for that purpose; that the deed absolutely terminated the original contract; that the latter "was never revived nor renewed by the parties hereto *subsequent to April 4, 1933,* * * * either orally or in writing;" that such revival or renewal must under certain statutes of limitation be in writing; and that there is not now, and *since December 15, 1932,* there has not been, any agreement between the parties "concerning the purchase of said land;" that the agreement of April 4, 1933, contained the following provision: "It is agreed and understood between the parties hereto, that second party held a certain 'contract for deed' to the above premises, but that he is in default as to payments of interest and principal, for several years, and that there is also delinquent taxes on said lands. He agrees to deliver to First Parties all the crops raised on said lands for 1933 and 1934, free of expense to First Party, and said proceeds shall be applied towards payment of taxes, delinquent and current, first, and then on back interest and principal. He has surrendered the premises back, by way of quitclaim deed, dated December 15th, 1932, to First Parties. If, at the expiration of this lease, Second Party shall have made payments as to taxes, interest, and principal, satisfactory to First Parties, contract will be restored and reinstated."

242

Thus, in spite of the pleading of the conclusion that a revival or renewal subsequent to April 4, 1933, must be in writing, and the further conclusions that the purchase contract "was never revived nor renewed" after April 4, 1933, and that there had been no agreement concerning the purchase of the land since December 15, 1932, the question presented by the first affirmative defense is the interpretation of the final agreement under the circumstances shown.

As a second affirmative defense defendant alleged that he was uneducated and unable to read or write, except to sign his name, and that in all dealings with plaintiff he relied upon plaintiff's agent, M. J. Breen (but not that through fraud, mistake or accident the document failed to express the real intention of the parties); that it was agreed in 1932 that, in view of his defaults, he would quitclaim the land to plaintiff in abandonment of the original purchase contract and "that thereafter, in the future, should the parties so desire, defendant might again purchase the land;" that subsequently defendant leased the premises from plaintiff for the years 1933-1934 under the lease of April 4, 1933; "that this answering *defendant understood* by said lease that he was to turn over all crops raised on said premises to plaintiff herein and that if he did so, and if both parties mutually desired to do so, defendant would be allowed to repurchase the said premises upon the same terms and conditions as were contained in the original contract to purchase, and that he would be given credit for all payments he had made up to that time, or would make under the terms of said lease, upon the purchase price of said premises; and *defendant understood* further that at the expiration of the term of said lease, *the same* would expire unless the parties either executed a new contract for the purchase of said premises, or mutually agreed to revive the old contract; that in accordance with the terms of said lease, defendant turned over to plaintiff all crops raised thereon, amounting to the sum of $900, paid on or about September 4, 1934; that at the conclusion of the term of said lease no new contract to purchase was entered into, nor was the old one revived." Thus the ques-

tion tendered by the second affirmative defense is whether the language of the agreement, or defendant's alleged understanding of it, is to govern.

It is apparent that the latter pleading is insufficient to constitute a defense to plaintiff's cause of action. It alleges no absurdity (sec. 7529, Rev. Codes), ambiguity (sec. 7540, Rev. Codes), repugnancy (sec. 7543, Rev. Codes), inconsistency (sec. 7544, Rev. Codes) or uncertainty (sec. 7545, Rev. Codes) other than that which might result from the printed provision for sale by the lessor, of which, as noted below, sections 7542 and 10523, Revised Codes, dispose; it does not allege that through fraud, mistake or accident the contract failed to express the real intention of the parties (sec. 7531, Rev. Codes); it states no facts showing that his understanding of the agreement was affected by any ambiguity or uncertainty in the words used, or if so that plaintiff was aware of such understanding on his part (sec. 7540, Rev. Codes); and the evidence, as below outlined, shows that defendant did not understand it as alleged in this defense. It does not show that the subject matter or the circumstances give other meaning to the contract than its words naturally import (sec. 7538, Rev. Codes). The mere allegation as to his understanding of the written agreement is clearly insufficient to change its meaning. For in general, the language of a contract governs its interpretation (sec. 7529, Rev. Codes) and is to be understood in its ordinary and popular sense (sec. 7535, Rev. Codes); and the intention of the parties is, if possible, to be ascertained from the writing alone (sec. 7530); otherwise a written contract would not be worth the paper and ink used. The insufficiency of this defense was not in any way cured by the evidence.

The pleadings thus show that the contract of April 4, 1933, was more than a lease, and that it constituted part of the same transaction by which the quitclaim deed was given on December 15, 1932. Read together, as statute (sec. 7533, Rev. Codes) and reason require, the two documents effected at most a suspension, revival and modification of the original purchase contract; but

the suspension pending the satisfactory payments was obviously not of defendant's right to protect his equity by completing the purchase, since full payment would necessarily constitute a payment satisfactory to plaintiff. His right of purchase therefore existed throughout the so-called lease period, and he had more than a leasehold interest.

The issues framed by the pleadings were not materially altered by the evidence submitted. The testimony showed that nothing was paid after the first $600; that in December, 1932, when a total of $1,900 principal was due and unpaid, with interest and taxes, plaintiff's representative, Breen, desired to obtain additional security by deeding the land to defendant and obtaining a mortgage covering both this land and an additional quarter section belonging to the defendant's wife; that upon the latter's refusal to sign such mortgage, Breen obtained from defendant a quitclaim deed of the quarter section in controversy. According to the pleadings and evidence of both parties, it was then understood that a further agreement should be entered into and the agreement was in fact made on April 4, 1933, upon a printed "farm rental contract" form, leasing the premises to defendant from April 4, 1933, to November 1, 1934, and providing that all the crops should be delivered to plaintiff to be applied upon taxes, "back interest and principal," and that if the payments were satisfactory to plaintiff, the original "contract *will be* restored and reinstated."

The printed lease form had the usual reservation of lessor's right to sell the premises during the term of the contract with protection of lessee's occupancy and crops for the current crop season. Breen testified that it was through an oversight that this provision was not stricken; but at any rate the printed provision is inconsistent with the main paragraph, which was typewritten and which clearly shows the intent of the parties. It is the paragraph pleaded in the affirmative defenses and set forth above, relative to the restoration and reinstatement of the purchase contract upon satisfactory payments being made. Being utterly inconsistent with the provision of the printed form for

sale to others than lessee, it controls the latter (secs. 7542 and 10523, Rev. Codes.)

Furthermore, the evidence showed that defendant at all times understood and acquiesced in the new agreement, with express reference to the typewritten paragraph. For (1) he accepted the arrangement, which required him to pay over the entire crop, and which therefore gave him nothing but the provision that if the proceeds were satisfactory to plaintiff the old contract would be restored and reinstated; (2) the entire crop proceeds were to be credited upon taxes, delinquent and current, and upon "back interest and principal" under the old contract; (3) at the end of the second and last crop year covered by the new agreement, when the crop proceeds for the two years, according to defendant's own testimony, were not over $100 or $200, he added enough of his own funds to make a total payment of $900, obviously so that it would be satisfactory to plaintiff, since he attempted no other explantion; (4) he stayed in possession thereafter, although the "lease" agreement had expired and although, as pleaded by him and as pointed out in the majority opinion, it expressly provided that unless renewed in writing it would end without notice, that he would at once vacate, and that his remaining would not be construed as renewing the lease period; (5) in 1936, according to Halcro, defendant offered to lease him this land and his wife's adjoining quarter section, and the lease was accordingly made; (6) the crops were negligible in 1936 and 1937, but in 1938, when 668.2 bushels of wheat were raised on this land, defendant, according to Halcro's testimony, had the latter segregate the crops from the two tracts; (7) defendant used in 1938 proceeds for his own purposes and testified that he did not at first know they were from this land, but that when he learned that fact he did nothing about it; (8) in 1939, when asked by plaintiff's agent, Breen, for a payment, he said that he could pay only what the land produced, and paid over the $73.12 landlord's share received from Halcro; (9) defendant then, according to Breen's testimony, which he did not deny, agreed to apply for a federal farm loan "to clean up the contract" if plaintiff would reduce

the amount due; (10) defendant applied for, and received, federal agricultural payments for this land in 1937, 1938 and 1940, all applications being signed by defendant as owner and showing Halcro as tenant; (11) in 1939, at Breen's insistence, defendant personally summer-fallowed part of the land; and (12) it was not until 1939 or 1940, according to the evidence, that defendant ever disowned interest in the land.

In spite of the pleadings and the evidence, the trial court found, as set forth in the majority opinion, that the quitclaim deed and the ''lease'' absolutely terminated the sale and purchase agreement; and the court concluded that the latter was never revived nor renewed. Thus the whole purpose and purport of the agreement of April 4, 1933, as shown by the pleadings and the evidence, are waved aside and the agreement construed as an ordinary lease. That action the majority opinion affirms.

It goes further and concludes that in the transactions Pfeifle did not ''exercise any judgment of his own but did what Breen told him to do and fully depended on Breen for advice,'' which is within neither the pleadings nor the evidence.

It seems obvious to me that the findings and conclusions, which were based upon the view that the so-called lease evidenced plaintiff's full resumption of title under the quitclaim deed and his full cancellation of the sale, were erroneous, and that the two documents constituted merely a suspension, revival and modification of the original purchase agreement by giving defendant until November 1, 1934, within which to protect and fully reinstate his rights by making satisfactory payments. Whether the errors are reversible depends on the questions presented by the pleadings, namely, the correct interpretation of the modified agreement, and in particular whether the latter required a further written agreement at the end of the two-year ''lease'' period in order fully to reinstate the purchase contract.

It is significant that the agreement provides that upon defendant's making payments satisfactory to plaintiff, the contract ''*will be* restored and reinstated,'' not that a new meeting of the minds will then be negotiated for that purpose, which of course

could not be a binding agreement, since it could not be enforced. Clearly, upon the making of the satisfactory payments the parties were entitled to regard the contract as automatically "restored and reinstated," and obviously they so regarded it. That is the only meaning which the provision could have had, and no further writing was necessary.

It is true that the terms and dates of payment were not stated, but the indefiniteness is not sufficient to invalidate the contract. For, as noted above, there can be no question that throughout the so-called leasehold period he had the right to complete payment, and that upon making during that period satisfactory payments short of the entire balance due, he had at least a reasonable time thereafter within which to complete payments (sec. 7548, Rev. Codes). Furthermore, his pleadings go further and allege his understanding that his extended right of repurchase was to be "upon the same terms and conditions as were contained in the original agreement," and therefore upon partial payments over a term of years; and his occupancy for at least five years after 1934, with plaintiff's assent, confirms that interpretation by both parties.

Defendant contends that the contract lacked mutuality because his rights were made to depend upon plaintiff's satisfaction with his payments, and therefore depended upon plaintiff's caprice. However, it is well settled that the test under such provision is whether the payments would be considered satisfactory by a reasonable person acting in good faith. (*Waite* v. *Shoemaker & Co.*, 50 Mont. 264, 146 Pac. 736; *Ogg* v. *Herman*, 71 Mont. 10, 227 Pac. 476; *Calvin* v. *Custer County*, 111 Mont. 162, 107 Pac. (2d) 134.)

It would seem that the payment of $900 should be satisfactory to a reasonable person, since the full crop on the land amounted to not over $100 or $200 and the landlord's usual one-fourth share of that crop, under the other leases shown, would have been only about $25 or $50, making a net payment out of defendant's pocket of some $850 or $875, nearly equivalent to two years' principal payments under the original contract. However, it is

unnecessary to consider the sufficiency of the payments; for since, by defendant's own testimony, they far exceeded the crop proceeds to which plaintiff was entitled either as the usual landlord's share or under the agreement of April 4, 1933, and since plaintiff accepted them without objection and permitted defendant to remain in possession for five or six years thereafter, it is obvious that if it were defendant who was trying to enforce the purchase contract plaintiff would not be heard, under the circumstances, to contend that the payments were insufficient and the contract dead. While the new agreement required only the payment of the small crop proceeds, defendant obviously knew or assumed that they would not be satisfactory to plaintiff but that the additional $700 or $800 would be so; for he paid the money at practically the end of the "lease" period and remained in possession for at least five years thereafter as of right.

It seems clear that the defendant understood and accepted the agreement as made, and that he did not seek to adopt the construction of the contract now urged by him until he concluded about 1939 or 1940 that he should repudiate the contract and avoid any liability under it. The situation is obviously one of those in which the parties have knowingly entered into a contract which, in view of subsequent events, one party without the other's fault has found burdensome and therefore now seeks to avoid. The situation may be unfortunate from the defendant's standpoint, but he has made his contract and the court has no authority to alter it for him; he has shown no equitable ground justifying the court's interference between the parties, and it seems to me that the plaintiff is clearly entitled to recover under the contract as made by them.

In my opinion the judgment should be reversed with directions to the trial court to enter judgment for plaintiff for the balance due from defendant under the contract, and for the foreclosure of the vendor's lien.

Rehearing denied November 16, 1940.